IN THE United States District Court
District of Delaware

06cv 472

Kevin C. Brathwaite
Petitioner

V.

Thomas Carroll
respondant

Opening Brief

DATE:

Kevin C. Brathwaite
D.C.C.# 315294
1181 Paddock Rd.
Smyrna DE.
19977

FILED
AUG - 8 2006
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

# Table of Contents

Table of citations III
Nature and Stage of proceedings 1
Summary of Arguments 2
Statement of Facts 3
Argument

I. Pro. se right to Self representation violated. 9
A. Exhaustion 9
1. Pro se material filed before trial. 9
2. Trial Court ignored invocation of right 10
3. No ruling Post trial 11

B. Pro se rights violated 12
1. Unequivocal request 12
2. No waiver of Pro se right 12

Summary 14

II. Concealment of exculpatory Evidence and State witness perjury, violated Petitioners right to a fair trial. 15

A. Trial Issue 15

1. State trial Evidence 15
2. Defense trial Evidence 16
3. Jury Decision 16
4. Post Trial Evidence 16

B. Trial Court used wrong Standard 16

1. Trial Court Standard 17
2. Chao standard required. 17
3. Difference between Hamilton and Chao 18
4. Court avoided perjury ruling 19
5. Same issue rejected in Chao 19

C. State Witness Perjury 20

1. False Testimony 20

a. Missing Pictures and Letters 21

i. Deberry Standard 21
ii. Missing Evidence Proves Perjury By State Witnesses and Racist Motive Therefore 22

b. Sir Olden Hue Chapman 23
c. Cassandra Moore 24
d. Romayne Jackson 24
e. Pictures 25
f. Perjury Admission 25

2. Perjurers Were Material Witnesses and There Would Be A Different Result 26
3. Defense Knowledge Was Inadequate 27

SUMMARY 28

Addendum 32

Conclusion 34

Brathwaite V. State, Del. Supr., NO. 169, 2003 Holland, J. (Dec. 29, 2003) (order) A-21

State V. Brathwaite, Del. Super., ID NO. 9510007098, Toliver, J. (March 17, 2003) (order) A-1

State V. Chao, Del. Super., IN 88-03-1021, Gebelein, J. (Feb. 17, 1995) (order) A-26

# TABLE OF CITATIONS

| Court Decisions | Page |
|---|---|
| Alexander V. Cahill, Del.Supr., 829 A.2d 117 (2003) | 14 |
| Blankenship V. State, Del.Supr., 447 A.2d 428 (1982) | 2, 17, 20, 26 |
| Brathwaite V. State, Del.Supr., No. 169, 2003, Holland, J. (Dec. 29, 2003) (Order) | A-21, 1, 21, 32 |
| Castro V. U.S., 124 S.Ct. 786 (2003) | 30, 32 |
| Deberry V. State, Del.Supr., 457 A.2d 744 (1983) | 22 |
| Dey V. Scully, 952 F.Supp. 957 (E.D.NY 1997) | 29, 30 |
| Faretta V. California, 95 S.Ct. 2525 (1975) | 12 |
| Franks V. Delaware, 98 S.Ct. 2674 (1978) | 21 |
| Hooks V. State, Del. Supr., 416 A.2d 189 (1980) | 12 |
| Kyles V. Whitley, 115 S.Ct. 1555 (1995) | 30 |
| Larrison V. U.S., 24 F.2d 82 (7th Cir. 1928) | 2, 20, 26 |
| Lloyd V. State, Del.Supr., 534 A.2d 1262 (1987) | 17 |
| McKaskle V. Wiggins, 465 U.S. 168 (1984) | 13 |
| Orazio V. Dugger, 876 F.2d 1508 (11th Cir. 1989) | 13, 14 |
| Potter V. State, Del.Supr., 547 A.2d 595 (1988) | 13 |
| Snowden V. State, Del.Supr., 672 A.2d 1017 (1996) | 12 |
| State V. Anderson, Del.Supr., 616 A.2d 1214 (1992) | 33 |
| State V. Brathwaite, Del.Supr., 741 A.2d 1025 (1999) | 1 |
| State V. Brathwaite, Del. Super., ID No. 9510007098, Toliver, J. (March 17, 2003) (Order) | A-1, 1, 2, 11, 16, 17, 19, 20, 23, 32 |
| State V. Chao, Del.Super., 1995 WL 413282 (1995) | 20 |
| State V. Chao, Del.Super., IN88-03-1021, Gebelein, J. (Feb. 17, 1995) (Order). | A-26, 2, 17, 18, 20, 21, 27, 28, 35 |

| | |
|---|---|
| State V. Hamilton, Del. Super, 406 A.2d 879 (1974) | 2, 17, 18 |
| State V. McDowell, Del. Super, 57 A.2d 94 (1947) | 33 |
| Stewart V. Dangel, 915 F.2d 572 (10th Cir. 1990) | 21 |
| Stigars V. State, Del. Supr, 674 A.2d 477 (1996) | 2, 11-13, 34 |
| Taylor V. State, Del. Supr, 679 A.2d 449 (1996) | 33 |
| U.S. V. Agurs, 96 S.Ct. 2392 (1976) | 29 |
| U.S. V. McKinley, 58 F.3d 1475 (10th Cir. 1995) | 14 |
| Weedon V. State, Del. Supr, 750 A.2d 521 (2000) | 34 |
| Woodford V. Visciotti, 123 S.Ct. 357 (2002) | 34 |
| Yost V. Johnson, Del. Supr, 591 A.2d 178 (1991) | 34 |

Statutes

| | |
|---|---|
| U.S. Const. Amend. 5, 6, 14 | 12, 30, 34, 35 |
| Del. Const. Art. 1, sec. 7, 8, 9 | 12, 30, 34, 35 |
| Supr. Ct. R. 102 | 33 |
| Super. Ct. Crim. R. 33, 61 | 30, 31, 32 |
| Prof. Cond. R. 3.3 | 33 |

NATURE AND STAGE OF PROCEEDINGS

Kevin Brathwaite (hereafter Defendant) was arrested upon a series of charges related to the alleged sexual assault of Carmen Rodriquiz (October 1995) and Salan Chapman (January 1996) (DI# 1, 2).[1] Defendant was tried and convicted (DI# 86). The direct appeal was denied (DI# 108). State v. Brathwaite, Del. Supr., 741 A.2d 1025 (1999).

Defendant filed post-trial motions. A motion to dismiss (DI# 89) and a motion for a new trial (DI# 109). The New Trial motion was amended on December 28, 2000 (DI# 131). Two evidentiary hearings were held (DI# 143, 147). Memorandums were filed (DI# 116, 125, 129). The motion to dismiss was never ruled upon. The motion for a New Trial was denied (DI# 159). State v. Brathwaite, Del. Super., ID NO. 9510007098, Toliver, J. (March 17, 2003) (order) (A-1) (hereafter Order).

Defendant's notice of appeal was filed (Supr. Ct. DI# 1, 7) and motion to proceed PRO SE were granted (Supr. Ct. DI# 16, 19, 22, 28).

Motions for production of documents (Supr. Ct. DI# 24, 25) and to stay in Delaware were filed (Supr. Ct. DI# 50), and denied. Brathwaite v. State, Del. Supr. NO. 169, 2003, Holland, J. (Dec. 29, 2003) (A-21).

This is Defendant's Opening Brief on appeal from the denial of the motions for a New Trial, production of documents, and to stay in Delaware.

---

(1) DI# refers to the Superior Court docket entries (unless otherwise noted).

# SUMMARY OF ARGUMENTS

I. Prior to trial, Defendant filed a motion invoking his right to self-representation. The trial court did not hold a hearing upon this PROSE motion and did not rule upon the motion. Defendant was forced to proceed to trial with appointed counsel. This violated Defendant's right to self-representation under the Delaware and United States constitutions. Stigars V. State, Del. Supr., 674 A.2d 477 (1996).

II. During the trial, material state witnesses committed perjury and concealed exculpatory evidence. Defendant was prevented from discovering and proving this misconduct until, after trial, when a material state witness confessed to the perjury and concealment. If the perjury and concealment had been disclosed at trial, Defendant would not have been convicted. When evaluating this New Trial claim, the trial court used the wrong standard. The trial court used the Hamilton[2] standard rather than the Blankenship / Larrison[3] standard. This error violated the Chao[4] precedent. The trial court failed to recognize that Defendant did not receive a fair trial.

---

(2) Order, p. 10, citing State V. Hamilton, Del. Super., 406 A.2d 879 (1974) (A-10).

(3) Blankenship V. State, Del. Supr., 447 A.2d 428 (1982) citing Larrison V. U.S., 24 F.2d 82 (7th Cir. 1928).

(4) State V. Chao, Del. Super., IN 88-03-1021, Gebelein, J. (Feb. 17, 1995) (Order) (A-26).

STATEMENT OF FACTS

This is a clear case involving attraction, jealousy, rejection and revenge.

Kevin Brathwaite (Defendant) is a former resident of Boston Massachusetts. After Highschool, Defendant entered Boston College on a football scholarship. In college, Defendant distinguished himself so much playing football that after 2½ years he was drafted by the New England Patriots. Defendant played for the Patriots for 8 years as a Fullback, earning national Championships and the respect of his fellow players as well as coaches and sports commentators. see Trial Trans (5); Remand trans, pp. 14-17 (DI #166).

In 1994, Defendant was brought to Delaware under extradition upon charges which were later dropped (strangely the extradiction authorities overlooked the fact that the perpetrator was white whereas Defendant is black?). Although the circumstances under which Defendant came to Delaware were bad, Defendant liked our close friendly little state. Thus, Defendant stayed in Delaware, working for local businesses

(5) Defendant's case file was turned over to Mr. Jerome M. Capone to prepare for the New Trial evidentiary hearings. Because Mr. Capone has failed to provide Defendant with access to the case file, Defendant is unable to attach relevant portions of the trial transcripts, motions or documents filed by counsel. Those documents still in Defendants' possession are attached (or cited as docket entries when possible) were relevant. see also p. 33, infra.

and leading a relatively uneventful, although high profile, life trading upon his accomplishments as a professional football player and other skills. Trial Trans.; Remand Trans., pp. 22 (DI #166).

Defendant met and had a precious little girl with Valerie Mitchell. After a couple years, Defendant began to have troubles in his relationship with Valerie and moved to a nice apartment outside of Wilmington (Colonial Apartments, Maryland Avenue and Broom Street). Trial Trans.; Remand Trans. p. 13 (DI #166). This is where Defendant's troubles began!

Being a football star, it was not hard for Defendant to meet local party girls. Through acquaintances, Defendant met Carmen Rodriguiz and Salan Chapman. Defendant partied with these women for a number of months, enjoying intimate relations. While entertaining, these relationships were far from fulfilling. As Defendant's daughter grew, Defendant longed to be a proper father and sought to reconcile with Valerie — this is the source of the present problems.

Salan Chapman had enjoyed the prestige and benefits of being seen around town with a professional football star. Doors were opened for her, her friends flattered her, and whenever she entered a club or home clinging to Defendant — Salan became the center of attention! However, this triumph was threatened by Valerie!

To add insult to injury, Valerie is white and Salan is black. While not being a psychologist, it is apparant that Salan harbored some deepseated resentment towards white women — a fact Salan did not hide from Defendant (who is also black). The fact that Defendant may leave Salan was difficult enough, but the fact that Salan was to be rejected — to be replaced by a white woman — was intolerable!

Salan would not allow Defendant to slip away. Salan knew Defendant's weaknesses and maneuvered and manipulated (A-56) him in an attempt to keep her prize away from Valerie ("the White Bitch", A-50). Sometimes it worked, sometimes it did not. But the truth is that Salan realized that Defendant's paternal instincts were unquenchable, Salan feared losing her meal ticket and she grew even more desperate (A-57). see also Trial Trans.

Salan Chapman and Carmen Rodriguiz hatched plans for Rodriguiz to get paid and for Salan to get Defendant back. The plot was for Rodriguiz to lodge a sexual assault complaint against Defendant (October 1995), and for Salan to ride to Defendant's rescue, saving Defendant from the evil Rodriguiz, and thereby win Defendant back. Trial Trans.

Such trickery works for but a little time, and in this case it was very little. Salan played her part like a

professional, and thought she had won her prize. For the next couple months Salan comforted Defendant and enjoyed his gratitude. Salan was happy once again — that is until the day she came to Defendant's apartment unexpectantly one cold January and was met at the door by the "White Bitch" (A-50). Trial Trans.

Salan was devastated! Salan was distraught! And, Salan wanted revenge! Salan ran to one of her boyfriends appearing distressed and angry (A-37,38). Salan wanted to hurt Defendant. Not only to hurt Defendant, but to damage him so much that no one would want him (A-50).

Salan knew how devasted and distraught Defendant was after Rodriquiz made the false (October) rape allegations. Salan (like so many jaded women) knew that rape was the ultimate betrayal — and since Salan had been betrayed, why shouldn't she turn the tables upon Defendant? This is why Salan made the false rape charges against Defendant in January 1996! Trial Trans.; A-50.

Defendant was arrested and held at the prison waiting for bail and trial (DI#1,80). But Salan still could not abandon her dreams and give up on Defendant. Salan thought she could still have Defendant. Remarkably, Salan even made visits to Defendant — while Defendant was being held in prison! Trial Trans.; Trial Exhibits.

Defendant was appointed an attorney, Mr. David Facciolo. Defendant explained to Mr. Facciolo what had happened and why (as hypostatized above). However, as the months of Defendant's pre-trial incarceration mounted and the seriousness of the charges dawned, Defendant grew increasingly dissatisfied with Mr. Facciolo's representation. Defendant decided his only choice was to represent himself. On March 3, 1997, Defendants' self-representation motion was filed in the trial court (DI #27). Defendant then corresponded heavily with the trial court to reiterate his desire to represent himself (DI #23, 24, 26-32, 40, 46, 47, 50-52).

As a result, Mr. Facciolo filed a motion to withdraw as Defendant's counsel, which was granted (DI #70, 72). Defendant was informed that Mr. Facciolo was withdrawing and that Defendant would get another attorney. Defendant told Mr. Facciolo that Defendant still wanted to represent himself, (that the PROSE motion was still pending) Mr. Facciolo told Defendant that the PROSE motion had been denied, that Judges never held hearings on such motions, and that Defendant should not bring it up again or the Judge would get mad at Defendant (DI #147, pp. 46-47; DI #143, pp. 13, 69, 72, 79-80, 88-100). The Court then appointed Mr. Thomas Foley to represent Defendant (DI #72). Thus, Defendant felt that he had no choice but to proceed with the attorney that

the trial court was forcing upon Defendant.

Defendant told both attorneys that the charges against him were false — that the sex was with consent and that Defendant had pictures and a videotape to prove it (DI#147, pp. 19, 39-44, 105-06, 108-20). However, someone (Salan?) knew the evidence existed and had entered Defendant's apartment and removed this exculpatory evidence before trial (A-50, "Do you remember those pictures you were trying to find? Well, I'm the one who had them."; DI#109, Ex. H. 3; DI#147, pp. 84). Salan testified knowing that this exculpatory evidence would not be available to prove the charges were false (DI#109, Ex. H. 3, A-50 "I told you that I was going to get your Black Ass"). Salan did not confess to this concealment until after trial (DI#109, Ex. H. 3, A-50).

Upon receiving the pictures from Salan, Defendant became aware of where they were. So Defendant (indirectly) asked Salan's sister Carmen Chapman for the pictures, subsequently obtaining 7 of the pictures (DI#147, pp. 40-44, 85-88). Based thereupon, Defendant filed a motion for a New Trial (DI#109). However, prior to the evidentiary hearings, correctional officers confiscated the pictures and letters (DI#147, pp. 44, 57-60, 66-75). And, then the Attorney General lost the letters and pictures (DI#143, pp. 4-6, 19-20).

This is Defendant's Opening Brief from the denial of the motion for a New Trial and subsequent motions.

# I. PRO SE RIGHT TO SELF REPRESENTATION VIOLATED

---

The standard and scope of review applicable to this argument is de novo: whether the trial court's failure to honor Defendant's explicit motion to invoke his PRO SE right, before trial, was a structual error which requires a new trial.

---

The trial court's failure to honor Defendant's explicit motion, invoking his right to self-representation at trial, violated Defendant's constitutional rights and requires a new trial.

## A. EXHAUSTION

Defendant raised the self-representation issue <u>before</u> trial, in his motion for a new trial, and at the evidentiary hearings:

### i. PRO SE MOTION FILED BEFORE TRIAL

Prior to trial, Defendant filed a motion to invoke his right to represent himself, and renewed this motion both in writing and in open court:

a. On March 3, 1997, Defendant filed the motion to proceed PRO SE (DI#27);

b. On March 10, 1997, Defendant reiterated this motion (DI #31);

c. On March 13, 1997, Defendant attempted to exercise this right (DI #50);

d. On March 18, 1997, Defendant attempted to exercise this right (DI #51);

e. On April 25, 1997, Defendant attempted to exercise this right (DI #40);

f. On May 5, 1997, Defendant attempted to exercise this right (DI #44)

g. On May 19, 1997, Defendant attempted to invoke and exercise his PRO SE right in open court (DI #49);

h. On May 27, 1997, Defendant attempted to invoke and exercise his PRO SE right in open court (DI #56).

These facts prove that Defendant clearly and unequivocally invoked his constitutional right to represent himself before trial.

2. TRIAL COURT IGNORED INVOCATION OF RIGHT

Each time that Defendant wrote to the trial court or orally invoked his right to represent himself, the trial court referred the matter to appointed counsel or otherwise ignored the requests:

a. On February 12, 1997, Defendant's letter forwarded to appointed counsel (DI #24);

b. On March 7, 1997, Defendant's PRO SE motion and letters forwarded to appointed counsel (DI#30);

c. On May 19, 1997, Defendant's oral motion to court, court refused to hear motion (DI#49);

d. On May 27, 1997, Defendant's oral motion to the trial court, court refused to hear motion (DI#56).

3. NO RULING POST-TRIAL

The trial court's failure or refusal to rule upon Defendant's motions invoking his right to self-representation was exhausted post-trial. On November 27, 2000, the motion for a new trial was specifically amended "to add" the Stigars (6) right to self-representation violation (DI #131). This PRO SE right violation was argued at the November 2, 2001 evidentiary hearing (DI#147, pp. 46-49) and at the May 21, 2002 evidentiary hearing (DI#143, pp. 13, 68-74, 79, 88-100). The State answered that Defendant had "no constitutional right to proceed pro se" at trial (DI#143, p. 69, lines 21-22). However, again, the trial court failed to rule on this PRO SE right violation issue. see Order (A-1 ). see also Remand trans., DI#166, pp. 47-50.

(6) Stigars V. State, Del. Supr., 674 A.2d 477 (1996). It is to be noted that the trial judge in Stigars is the same judge in this case.

## B. PRO SE RIGHT VIOLATED

The right to represent oneself in a criminal proceeding is fundamental. It is protected by both the Delaware and United States constitutions. Del. Const. Art. I, sec. 7; U.S. Const. Amend. 6; Stigars, 674 A.2d at 479, citing Hooks V. State, Del. Supr., 416 A.2d 189, 197 (1980) and Faretta V. California, 95 S. Ct. 2525, 2527 (1975) and Snowden V. State, Del. Supr., 672 A.2d 1017 (1996).

### 1. UNEQUIVOCAL REQUEST

The trial court is required to scrupulously honor an unequivocal request to proceed PRO SE. Stigars, 674 A.2d at 479-80. It is clear that Defendant clearly and unequivocally invoked his constitutional right to represent himself. see "Motion To Proceed PRO SE filed" (Doc# 27).

### 2. NO WAIVER OF PRO SE RIGHT

When a defendant "clearly and unequivocally" waives his right to counsel by demanding his right to represent himself in a timely manner, the exercise of that right must be scrupulously respected through all critical stages of the criminal prosecution and cannot be revoked without affirmative action by the defendant to rescind his waiver and reinstate his right to counsel. Snowden, 672 A.2d at 1022 n.3 (express approval required);

McKaskle V. Wiggins, 465 U.S. 168, 183-84 (1984) (same); Orazio V. Dugger, 876 F.2d 1508, 1512 (11th Cir. 1989) (no waiver).

This Court has repeatedly emphasized the importance of the trial court record in the courts review of whether a defendant has waived a constitutional right. The right to self-representation is central to our adversarial system of justice and is specifically guaranteed by the Delaware constitution; therefore, any waiver affecting that right must be clearly shown in the record. Stigars, 674 A.2d at 480.

The importance of the right to self-representation requires that once a defendant effectively invokes his right to proceed PRO SE, a later revocation of that request must appear on the record. Here the record shows that the trial court never ruled upon the motion. There is nothing in the record to show that Defendant withdrew or otherwise waived the right to self-representation. Absent a clear revocation by Defendant of his previously asserted request to represent himself, the court should conclude that the trial court erred when it forced Defendant to accept the services of his court appointed counsel; and in so erring the trial court violated Defendant's constitutional right to self-representation. This requries a reversal. Stigars, 674 A.2d at 480-81; Potter V. State, Del. Supr., 547 A.2d 595, 602 (1988) (same).




## SUMMARY

This Court has repeatedly stated that it is improper for a trial court to avoid ruling upon a timely motion. Alexander V. Cahill, Del. Supr., 829 A.2d 117, 129-30 (2003). Thus, a trial court may not avoid a ruling on a firm request by defendant to represent himself. / Neither should a defendant be required to continually renew his request to represent himself. / After a clear request, a defendant must be heard and a ruling made, or the case will be vacated on appeal. Id.; U.S. V. McKinley, 58 F.3d 1475, 1480-82 (10th Cir. 1995) (no hearing); Orazio, 876 F.2d at 1512 ("not required continually to renew... or to make fruitless motions ... to preserve the issue").

Defendant clearly invoked his right to self-representation. The trial court clearly failed to rule upon these motions. Defendants' right to self-representation was clearly violated. In addition, direct appeal counsel failed to raise this issue on direct appeal, which is grounds to grant this claim for relief. Orazio, 876 F.2d at 1512-14 (cause and prejudice proven by failure to raise claim on appeal).

For these reasons, the convictions and sentences should be vacated.

## II. CONCEALMENT OF EXCULPATORY EVIDENCE AND STATE WITNESS PERJURY VIOLATED DEFENDANTS' RIGHT TO A FAIR TRIAL

---

The standard and scope of review applicable to this argument is de novo: whether the trial court used the wrong standards to decide the issues — did concealment of exculpatory evidence and state witness perjury violate Defendants' right to a fair trial which requires a new trial.

---

State concealment of exculpatory evidence and state witness perjury violated Defendants' right to a fair trial.

### A. TRIAL ISSUE

At trial, credibility was the only issue for the jury to decide: whether the sexual acts were with or without consent.

#### 1. STATE TRIAL EVIDENCE

At trial, the State presented the testimony of the accusers to establish Defendants' sexual assault of Salan Chapman and Carmen Rodriquiz. Ms. Chapman testified that she was assaulted without her consent,[7] that she had only been to Defendants' apartment once,[8]

---

(7) DI# 99-102, 106.

(8) Police statement, p. 26 (Q 215 → A216) (A-38); DI# 99-102, 106.

and that she never had sex with Defendant prior to the alleged assault.[9]

2. DEFENSE TRIAL EVIDENCE

At trial, Defendant testified that the sex with the accusers was with their consent, that they had been to Defendant's apartment numerous times, and that Defendant had sex with the accusers on numerous occassions with her consent — including on the occassion of the alleged assault.[10]

3. JURY DECISION

Given the above facts, the trial jury found the accusers to be more credible than Defendant, and, thus, convicted Defendant upon all charges. (DI# 86).

4. POST-TRIAL EVIDENCE

After trial, Defendant obtained letters, pictures, and affidavits which prove that Ms. Chapman committed material perjury at trial. (DI# 109).

B. TRIAL COURT USED WRONG STANDARD

The New Trial motion (DI# 109) proved that Defendant was entitled to a new trial because material state witnesses committed perjury at trial by denying

---

(9) Police statement, p.26 (Q219 → A220)(A-38); Doc# 99-102, 106.

(10) Ct. Order; Doc# 99-102, 106.

that the sex was consentual and by concealing exculpatory pictures and racist motive evidence. However, when evaluating this claim for relief the trial court used the wrong standard!

1. TRIAL COURT STANDARD

The trial court used the newly discovered evidence standard articulated in State v. Hamilton, Del.Super., 406 A.2d 879, 880 (1974), and accepted the State's argument that Defendant "has failed to meet any of these requirements". Ct. Order, pp. 10-11 (A-10-11).

2. Choa STANDARD REQUIRED

In Chao[11], the trial court distinguished between the "newly discovered evidence" standard enunciated in Hamilton [and reinterated in Lloyd v. State, Del.Supr., 534 A.2d 1262 (1987)] and that enunciated in Blankenship v. State, Del.Supr., 447 A.2d 428 (1982) [citing to Larrison v. U.S., 24 F.2d 82, 87-88 (7th Cir. 1928)]. Chao, pp. 2-4 (A-28-30). The Chao court stated that:

> In the present case, however, the new evidence clearly demonstrates that one of the State's primary witnesses committed perjury at defendant's trial... It appears, therefore, that the Supreme Court has decided to apply the Larrison test where defendant bases his new trial motion on perjured testimony. Therefore, this Court must apply the Larrison standard in this case.

Chao, p.4 (A-30) (emphasis added).

---

(11) State v. Chao, Del.Super., IN88-03-1021, et seq., Gebelein, J. (Feb. 17, 1995) (Order) (A-26).

## 3. DIFFERENCES BETWEEN HAMILTON AND CHAO

Both Hamilton and Chao required that the evidence in question must pertain to material evidence or testimony. However, there are obvious deferences between Hamilton and Chao!

Whereas Hamilton focuses upon whether the evidence was available prior to trial and why it was not introduced at trial, Chao focuses upon the effect the false testimony had upon the outcome. Hamilton is concerned with the competence of defense counsel (why was the new evidence not "discovered" before trial) whereas Chao is concerned with what is essentially a structural error (false testimony on a material element). Chao, pp. 2-4 (A-28-30).

The determinative standards are also quite different. Hamilton requires a showing that the new evidence "would probably(12) produce an acquittal". However, Chao requires only a showing that the "jury might(13) have reached a different conclusion." Chao, pp. 2-3 (A-28-29). In spite of the lexicology(14) involved, the bottom line is that Defendant's trial court utilized the wrong standard to evaluate the accusers material perjury.

---

(12) Probable - likely to occur or be; that can reasonably but not certainly be expected; reasonably so, as on the basis of evidence

(13) Might - generally equivalent to may in meaning and use, with the following functions: a) expressing esp. a shade of doubt or a lesser degree of possibility.

(14) We continue to struggle with the "probable" as opposed to "possible" (syn. of might) deictic or dichotomy.

4. COURT AVOIDED PERJURY RULING

The trial court also never considered whether the state witnesses testified falsely or committed perjury. Rather, the court avoided this allegation and went on to decide:

> As for the anonymous letter, Mr. Brathwaite claims that it proves that Ms. Chapman concocted a scheme to have him convicted on false charges due to her hurt feelings over their recent breakup. However, Mr. Brathwaite also had the opportunity at trial to present his the theory that Ms. Chapman made up her story and lied under oath. Presentation of the letter now in support of that same theory does not constitute newly discovered evidence, nor does it justify granting a new trial.

Ct. Order, pp. 12-13 (A-12-13) (emphasis added).

a. Same Issue Rejected In Chao

The exact same issue was raised by the State in opposition to the Chao New Trial motion and on reargument. In each instance, the court rejected that position, stating that:

> Even if defendant knew immediately that [the accuser] had perjured [her]self at trial, [he] would still have been surprized. Defendant might well have anticipated what [the accusers] would probably answer to questions about the two issues had they been answered truthfully. When [the accusers] denied having any sexual relations ... and downplayed [her] involvement with [him], [he] could not have been but surprized by [her] answers.
>
> ....

> The Court concludes that while defendant knew of the falsity of [the accusers] testimony, [he] was not in a position to effectively counter that false testimony.

Chao, pp. 9-10 (A-35-36)(emphasis added); State V. Chao, Del. Super., 1995 WL 413282 (1995)(reargument denied).

C. STATE WITNESS PERJURY

For Defendant to obtain a new trial based upon witness perjury, the Larrison test requires: (1) the court to be reasonably well satisfied that the testimony given by a material witness was false, (2) that had this material witness testified truthfully, the jury might have reached a different conclusion, and (3) that Defendant was taken by surprize when the false testimony was given and was unable to meet it. Chao, p. 3 (A-29) [adopting the Larrison test to material witness perjury, and citing Blankenship, 447 A.2d at 433].

1. FALSE TESTIMONY

When a witness is sworn in to testify at trial, the witness swears to tell the "whole truth." It is the obligation of the State, as well as the witnesses, to insure that testimony given is the "whole truth." When a witness testifies in a manner which the witness or the State knews conceals material facts from the court and trial jury, that testimony is not the "whole truth." It is a material omission which effectively conceals the "whole truth" and amounts to perjury. Such false testimony is a violation of both the witness' and the State's obligations, and (especially in this case)

violates defendant's right to a fair trial. Chao, p. 10 (A-36); see also Stewart V. Dongel, 915 F.2d 572, 581-83 (10th Cir. 1990) (deliberate falsehood and reckless disregard standards of Franks V. Delaware, 98 S.Ct. 2674 (1978) applied to material omissions as well as affirmative falsehoods) (citing cases).

a. Missing Pictures and Letters

After trial, Defendant received several exculpatory letters and pictures, in the mail, from the accuser and her sister.(15) These exculpatory letters and pictures were confiscated from Defendant, by correctional officers just prior to the November 2, 2001 evidentiary hearing (apparantly upon orders from the Attorney General's office).(16) Prior to the May 21, 2002 evidentiary hearing, the Attorney General's office claimed that this exculpatory evidence was in their possession but is now mysteriously missing from the AG's office.(17) Now, the AG's office claims that the exculpatory evidence is lost by the AG's office!(18)

i. Deberry Standard

In Debbery, this Court stated that the failure of the State to produce evidence in its possession permitted

---

(15) DI #109; DI #89; DI #147.
(16) DI # 147, pp. 39, 44, 49, 66, 96-97; DI #143, pp. 6, 45-60, 75-76, 84.
(17) DI # 143, pp. 4-6, 19-20, 30-40.
(18) Brathwaite V. State, Del. Supr., NO. 169, 2003, Holland, J. (Dec. 29, 2003) (order at para. 5, pp. 3-4) (A-23).

inference that evidence would have been "exculpatory in nature" and "favorable" to defendant. Deberry v. State, Del. Supr., 457 A.2d 744, 754 (1983). Consistent therewith, at the May 21, 2002 evidentiary hearing, the trial court ruled that the missing evidence contained exculpatory evidence as alleged by Defendant.(19)

ii. Missing Evidence Proves Perjury By State Witnesses and Racist Motive Therefore

Both at the evidentiary hearings and by way of affidavits, Defendant has proven that the state witnesses committed perjury and withheld exculpatory evidence at the criminal trial. Specifically, that:

a.1. At trial, Salan Chapman testified that she had no consentual sexual relations with Defendant.

a.2. Pictures #1 to #7 prove that Salan Chapman had consentual sexual relations with Defendant on numerous occassions.

b.1. At trial, Salan Chapman testified that she had never been in Defendant's bedroom.

b.2. Pictures #3 and #4 prove that Salan Chapman was in Defendant's bedroom, naked, on at least two prior occassions.

---

(19) DI #143, p.12: "I can assume that that's what they would say", "But I understand this is what you represent that was taken and what you would have presented. I can accept that."

c.1. At trial, Salan Chapman testified that she never had consentual sexual relations with Defendant in Defendant's bedroom.

c.2. Pictures #1 and #5 prove that Salan Chapman had consentual sexual relations with Defendant in Defendant's bedroom.

d.1. At trial, Salan Chapman testified that she had never had consentual sexual relations with Defendant in Defendant's living room.

d.2. Pictures #5, #6, #7 prove that Salan Chapman had consentual sexual relations with Defendant in Defendant's living room on at least three separate occassions.

e.1. At trial, Salan Chapman testified that she would give truthful testimony.

e.2. Letters #1, #2, #3 prove that Salan Chapman did not testify truthfully and that she withheld and concealed exculpatory evidence from Defendant's trial.

f.1. Letter #2 proves that the motive for Salan Chapman testifying falsely was racist hatred and jealousy.

g.1. Letter #1 proves that Salan Chapman conspired with Carmen Rodreguiz to testify falsely at Defendant's trial.

see Defendant's Affidavit, <u>Supr. Ct.</u> DI #43; DI #147, pp. 36-44, 49, 52, 85-87; DI #143, pp. 9-11, 19-20; <u>Ct. Order</u>, pp. 3-4, 9-10 (A-3-4, 9-10).

b. Sir Olden Hue Chapman

At the November 2, 2001 evidentiary hearing, the State <u>stipulated</u> to the "testimony of Sir Olden Chapman by affidavit" (DI #147, p. 7, lines 18-20). Sir Olden is

the accusers' cousin. Sir Olden's Affidavit[20] proves that Ms. Chapman's denial of a 6 month sexual relationship with Defendant was false[21]. Sir Olden's Affidavit proves that Ms. Chapan lived with Defendant at Defendant's apartment for 6 months.[22]

c. Cassandra Moore

Cassandra Moore also testified by Affidavit. Ms. Moore's Affidavit[23] proves that Ms. Chapman had a racist motive to make false accusations against Defendant — that Ms. Chapman was jeolous[24] of Defendant's relationship with other woomen — especially a white women.[25]

d. Romayne Jackson

Romayne Jackson also testified by Affidavit. Ms. Jackson's Affidavit[26] proves that the allegations against Defendant were "concocted" to "get back" at Defendant for his relationship with a white women.

---

(20) DI #109, Ex H. 4-6 (A-51-53).

(21) Id. (A-52: "involved from the summer of 1995 and January of 1996").

(22) Id. (A-52: "Summer of 1995 and January of 1996", "wearing only a night-gown", "she had just gotten out of bed", "call... middle of the night... would answer the phone").

(23) DI #109, Ex H. 10-11 (A-57-58).

(24) Id., (A-57: "Salan answered the phone and was very agitated that another female was calling", "proceeded to curse at me", "continuously following him around and harrassing him").

(25) The white woman is Valerie Mitchell, the mother of Defendant's (then) nine year old daughter, whom Defendant was reconciled with.

(26) DI #109, Ex. H. 9 (A-56).

e. Pictures

At trial, Ms. Chapman testified that she had not had sexual relations with Defendant prior to the alleged attack. After trial, Ms. Chapman sent Defendant pictures that were taken of her (by Defendant) in sexually compromising positions during Ms. Chapman's 6 month relationship with Defendant.(27) These pictures prove that Ms. Chapman's testimony was not the "whole truth" — that Ms. Chapman (the accusers) possessed exculpatory evidence yet concealed and withheld that evidence from the defense!

f. Perjury Admission

At trial, Ms. Chapman swore that she would tell the truth and testified that she had no prior sexual relationship with Defendant and held no prior anamosity towards Defendant. After trial, Ms. Chapman sent a letter(28) to Defendant which proves that Ms. Chapman was jeolous of Defendant's relations with a white(29) woman ("white bitch"), that Ms. Chapman held anamosity towards Defendant ("I was going to get your blackass"), and that Ms. Chapman withheld this evidence from the defense ("Do you remember those pictures you were trying to find? Well, I'm the one who had them").

---

(27) DI# 109, Ex. H. 2 (A—47-49).
(28) DI# 109, Ex. H. 3 (A—50); Handwriting analysis, although inconclusive, did shown similarities, see DI# 138, state exhibit No. 9.
(29). see footnote No. 5, supra.

2. PERJURERS WERE MATERIAL WITNESSES AND THERE WOULD BE A DIFFERENT RESULT

Credibility was the only disputed issue in the criminal trial to be resolved by the jury — was the sexual encounter, on the date alleged, consentual or non-consentual? The accusers claimed that the sex was non-consentual. Defendant answered that the sex was consentual. There were no other people in the room who witnessed or testified concerning the sexual acts between Defendant and the accusers. In other words, without the accusers false testimony, there would not be any evidence to convict Defendant. Cf. Blankenship, 447 A.2d at 434 (no "other credible evidence against" defendant, discussing 2nd prong of Larrison test). Thus, the accusers were clearly material witnesses.

The State's theory of the crime relied exclusively upon the testimony of the accusers. The State based its argument on the trial jury finding who had a motive to lie at trial — was it Defendant or the accusers? The prosecutor repeatedly vouched for ms. Chapman's credibility and repeatedly emphasized to the jury that only Defendant had a motive to lie. Thus, under the State's theory, only ms. Chapman's testimony was believable.

The question of credibility being the crux of the State's case, the prosecutor argued that the jury resolve all

inconsistencies in testimony and credibility problems (of which there are many) in the State's favor, by arguing that only the State's witnesses were believable because they alone had an accurate memory and no motive to falsely accuse Defendant.

Given that the State made so much of the reliability of the accusers, if the perjured testimony had been corrected, then the accuser's "non-consentual" sex testimony might have been subject to doubt. The jury might have heard the true testimony — that the accusers were jeolous of Defendant and fabricated these accusations to retaliate for what the accusers perceived as rejection by Defendant's love for a white woman!

The significance of the accusers' true testimony is that the jury would have heard evidence from which they would know that the charges were fabricated and the reasons why. Ultimately, the trial jury would not have found the State's evidence as persuasive. The jury would indeed have realized that the State's non-consent arguments were useless. Thus, with the accusers' true testimony, the jury might have found a different result in a case where the State has acknowledged that the accusers credibility was the only proof issue! Cf. Chao, p.8 (A-34).

3. DEFENSE KNOWLEDGE WAS INADEQUATE

At trial, the defense denied committing the crimes. Although Defendant was aware of the circumstances of the allegations and defense counsel attempted to cross-examine the accusers, without an acknowledgment from the accusers that the accusations were false - that the sex was consensual - and that the accusers' testimony against Defendant was perjured, Defendant was in no position to effectively counter the false testimony. Cf. Chao, p. 9 (A-35).

## SUMMARY

If it were not for the accusers' false accusation of non-consensual sex with Defendant, or if the accusers had admitted at trial that she had prior consensual sexual encounters with Defendant and that the accusers felt a racist jealous rage whe Defendant refused to terminate his relationship with a "white" woman, it is very possible that the jury "might" have reached a different conclusion. If the accusers had testified truthfully, that the sex was consensual or that she was jealous of Defendant, the trial jury "might" have reached a different conclusion.

The bottom line is that, at trial, Defendant could not "effectively counter" the accusers false testimony. However, we now have evidence that the accusers committed perjury at trial, covering up her jealousy and consensual sex.

If the jury would have heard the true testimony, not only "might" they have reached a different verdict, but the jury would have had no choice but to return a verdict of not guilty!

The concept of fundamental fairness has been described as "elusive". In making the determination of whether a defendant's right to a fundamentally fair trial has been violated, courts have been directed to examine "the materiality of the excluded evidence." Such an inquiry requires courts to evaluate "what the impact of the excluded evidence would have been if it had been admitted," and more precisely, whether it might "have created a reasonable doubt that did not otherwise exist." Cf. Dey V. Scully, 952 F.Supp. 957, 971 (E.D.NY 1997).

The courts have stated that:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt... It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed... additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

U.S. V. Agurs, 96 S.Ct. 2392, 2401-02 (1976).

In evaluating the concealed evidence in context, it should be noted that the accusers admission of consentual sex with

Defendant, and concealment of exculpatory pictures and her jealous racist motives would not have been merely cumulative. The courts have long noted that the issue of perjury (or even withholding exculpatory evidence) is absolutely fundamental to a criminal trial. Accordingly, if evidence undermining confidence in the consent (especially that of a jealous racist woman) was excluded (or as in this case, hidden or concealed by the State), postconviction relief is required. Dey, 952 F.Supp. at 972, n.14; Kyler v. Whitley, 115 S.Ct. 1555, 1565-69 (1995).

Based upon a review of the evidence in the entire record and the concealed evidence, this Court should conclude that Ms. Chapman's perjury and concealment of both exculpatory evidence and motive, if received in evidence, "might" have created a reasonable doubt that did not otherwise exist; and, thus, Defendant was deprived of a fundamentally fair trial. Del. Const. Art. 1, sec. 7-9; U.S. Const. Amend. 6, 14

It was improper for the trial court to recharacterize[30] the New Trial motion as a postconviction motion (i.e. from Rule 33 to Rule 61). Even so, perjury or concealment is "cause" for Rule 61 (i)(3)(5). The perjury and concealment (proven in this case) was upon a materially crucial and

---

(30) see Castro v. U.S., 124 S.Ct. 786, 791-92 (2003).

determinative issue: consent! If Ms. Chapman would have testified truthfully at trial and disclosed the concealed evidence to the jury, Defendant would not have been convicted. Thus, Ms. Chapman's perjury and concealment was "prejudicial" to the defense. Therefore, if needed, Defendant has satisfied any procedural requirements of Rule 61(i)(3)(5).

For these reasons, the convictions and sentences should be vacated and the case remanded for a new trial.

# ADDENDUM

Defendant feels compelled to point out a couple issues that, although not necessarily dispositive, still need the attention of the Court.

## 1. Recharacterization

Defendant's motion was a New Trial motion under Super. Ct. Crim. R. 33 (DI #109). The trial court acknowledged such (A-2), but then recharacterized the motion as a postconviction motion under Rule 61 (A-14). While it has become common for the trial court to do so, such recharacterizations are improper without first given the defendant an explanation or an opportunity to withdraw or amend the motion. Otherwise, such recharacterizations act to foreclose a defendant's right to bring a postconviction motion in the future.[31] Rule 61(b)(2)(i)(1)(2).

## 2. Exile

The Courts' December 29, 2003 order states that the Court lacks jurisdiction to issue a writ of Mandamus to a non-judicial authority.[32] Order, at pp. 4-5 (A-25). As to

---

(31) For instance, Defendant will be barred from bringing a challenge to the multiplicity of charges and sentences, jury instructions, prejudicial argument or ineffective counsel. Compare Castro V. U.S., 124 S.Ct at 791-92, J. Scalia's "disagreement", at 794 ("risk of harming the litigate", "substitutes the litigants ability to bring his merits claim now, for the litigants' later ability to bring the same claim (or anyother claim) perhaps with stronger evidence").

(32) To stop the State from exiling Defendant from the Delaware prison system while this appeal is pending).

Mandamus, this is true. It is also true that "Mandamus should not be used to prevent the commission of an Act," State v. McDowell, Del.Super., 57 A.2d 94, 98 (1947). With this in mind, Defendant did not request a mandamus, but invoked this Court's inherent authority to prevent mischief with the prosecution of an appeal. Supr. Ct. R. 102(a)(6). (33) It is Defendant's position that the appeal provides this Court with jurisdiction over both the cause and the litigants (if this court can prevent property from being moved out of state while an appeal is pending, surely it can do the same for a prisoner?). It is hoped that the Court will continue to caution the State about unintended consequences of its decisions. (34)

3. Production

This Court's December 29, 2003 order states that the case file (i.e. transcripts, letters, motions) sought from Mr. Jerome Capone was already sent to Defendant. Order, pp. 2-3 (A-23). Defendant has not received the case file. Thus, this matter should be sent to the Disciplinary Counsel. Prof. Cond. R. 3.3(a)(1)(2)(4).

---

(33) The State claimed prisoners exiled to other states have access to Delaware research material. Defendant affidavit proves this false. This matter should be referred to the Disciplinary Counsel. Prof. Cond. R. 3.3.

(34) see Court's caution expressed in State v. Anderson, Del.Supr., 616 A.2d 1214 (1992) (p.5, para. 9), reiterated in Taylor v. State, Del.Supr., 679 A.2d 449 (1996) (abuse, commonsense enforcement). Unfortunately, the Court's December 29, 2003 order is already being cited by the State to justify retaliatory exile of other prisoners and to deprive this Court of jurisdiction to review such retaliatory motives. see Walls v. Taylor, Del.Supr., No. 489, 2003, State Answering Brief (appeal still pending) at pp. 13, Ex. (W).

CONCLUSION

There is a presumption that state courts know and follow the law. Woodford V. Visciotts, 123 S.Ct. 357, 360 (2002). However, when a state court fails to follow the law, resulting in unreliability or unfairness which deprives the defendant of any substantive or procedural rights to which the law entitles him, due process is violated and remand to or reversal of the lower court is required. Yost V. Johnson, Del.Supr., 591 A.2d 178, 182 (1991) (due process requires conformity with law); Weedon V. State, Del.Supr., 750 A.2d 521, 527-28 (2000) (remand); Del. Const. Art. 1, sec. 7-9; U.S. Const. 5, 6, 14.

The trial court clearly failed to hold a hearing or to rule upon Defendant's self-representation motion, and forced Defendant to accept appointed counsel. This violated Defendant's right to self-representation as guaranteed by the Delaware and United States constitutions. Stigars, 674 A.2d 477; Del. Const. Art. 1, sec. 7; U.S. Const. Amend. 6.

The trial court clearly used the wrong standard when evaluating Defendant's claims that material state witnesses committed prejudicial perjury. This error violated Defendant's right to due process as guaranteed by the Delaware and United States constitutions and this courts precedent. Yost, 591 A.2d at 182 (due

process); Chao, pp. 3 (A-29) (standard); Del. Const. Art. 1, sec. 7-9; U.S. Const. Amend. 5, 6, 14.

The trial court clearly failed to consider whether material state witnesses committed prejudicial perjury. And, the trial court failed to consider how this perjury and concealment of exculpatory evidence "might" have led to a different result. This violated Defendant's right to a fundamentally fair trial as guaranteed by precedent and both the Delaware and United States constitutions. Chao, at pp. 2-4 (A-28-30); Del. Const. Art. 1, sec. 7-9; U.S. Const. Amend. 5, 6, 14.

For these reasons, the convictions and sentences should be vacated and the case remanded for a new trial.

Date: January 30, 2004.

Respectfully submitted,

[signature]

Kevin C. Brathwaite

XC: Delaware Innocent Project

EXHIBIT - A

Sept, 5, 1998

The Honorable Charles H. Toliver IV
Superior Court
Daniel L. Herman Courthouse
1020 King St.
Wilmington De. 19801

RE: State v. Kevin Brathwaite 06cv472
ID.# 9510007098

FILED
AUG - 8 2006
U.S. DISTRICT COURT
DISTRICT OF DELAWARE
RG
scanned

Dear Judge Toliver:

I am writing you this letter to request a time extension to file post verdict motions that need to be brought to the Courts attention. The extension is necessary, as I am waiting for material to be forwarded to me from the law library that is very pertinent to the motions I will be filing.

Thanking you in advance for your time and consideration to this matter

Sincerely
Kevin Brathwaite

C.C. Thomas Foley Esq.
Thomas Pederson Esq.
Prothonotarys office
Sen. Dianne Wilkerson

SUPERIOR COURT
OF THE
STATE OF DELAWARE

CHARLES H. TOLIVER, IV
JUDGE

DANIEL L. HERRMANN COURT HOUSE
WILMINGTON, DELAWARE

September 18, 1998

Kevin Brathwaite
MultiPurpose Criminal Justice Facility
1301 E. 12th Street
Wilmington, DE 19809

RE: State of Delaware v. Kevin Brathwaite
ID No. 9510007098

Dear Mr. Brathwaite:

Please be advised that I have now had the opportunity to review your letter dated September 5, 1998, which I received on September 11, 1998. Unfortunately, I am unable to grant the relief you seek.

More specifically, the "post verdict motions" that you refer in to your letter are governed in terms of procedure, by Court rule and statute. I cannot extend those deadlines. Consequently, you request must be, and hereby is, **denied**.

**IT IS SO ORDERED.**

Sincerely yours,

Charles H. Toliver, IV
Judge

CHT,IV/brd

cc: Prothonotary (original)

Sept, 29, 1998

The Honorable Charles H. Toliver IV
Superior Court
Daniel L. Herman Courthouse
1020 King St.
Wilmington De.
19801

RE: State V. Kevin C. Brathwaite
I.D.# 95I0007098

Dear Judge Toliver:

This letter is in regards to the reasons my request for a time extension was denied. You stated in your decision that my request was governed by terms of procedure, by Court rules and Statute. These are exactly the Same issues that are in dispute. "Court rules and procedure" or Failure to Abide by the Same. So therefore, At this time I am requesting that you review the Attached motion and reconsider your decision.

Sincerely
Kevin Brath[signature]

C.C. Thomas Foley.
Thomas Pederson
Prothonotary
Sen Dianne Wilkerson

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

OF AND FOR NEWCASTLE COUNTY

STATE OF DELAWARE )

V. ) I.D. #9510007098

KEVIN C. BRATHWAITE )

MOTION FOR MISTRIAL

Comes now the defendant, Kevin C. Brathwaite, requesting that this Honorable Court order that a mistrial be declared in the above mentioned case.

To support this motion, this defendant offers the following:

1. On March 3, 1997, the defendant Kevin C. Brathwaite filed a motion to proceed pro se' pursuant to Rule 47 Del. Sup. Ct. rules.
2. This motion was then referred to Judge Cooch on March 3, 1997.
3. On March 10, 1997 the defendant filed a letter with the court expressing his desire to exercise his right to proceed pro se'.
4. On March 13, 1997, the defendant filed a letter with the court expressing his concern about the way he was being mistreated, and attempted to exercise his right to proceed pro se'.
5. On March 18, 1997, the defendant filed a letter with the court expressing his concerns.
6. On March 21, 1997, the defendant filed a motion to participate with counsel in the defense as he was ordered to do.

7. On March 21, 1997, this motion was referred to Judge Alford.

8. On April 25, 1997, defendant filed a letter with the court expressing his concerns.

9. On May 5, 1997, the defendant filed a letter to the court expressing his concerns.

10. On May 19, 1997, the defendant made an oral request while he was present in court expressing his desire to exercise his right to proceed pro se', but his request were not acknowledged.

11. On May 27, 1997, the defendant once again was present in court and orally requested to exercise his right to proceed pro se' and once again he was denied to be heard.

12. On May 27, 1997, the defendant was told by his Public Defender that his motion to proceed pro se' had been denied.

13. On September 1, 1998, the defendant received a copy of the court docket sheet regarding this case, and it was discovered that the defendants motion to proceed pro se' was never heard nor ruled on.

14. This defendant states that the 6th Amendment of the U.S. Constitution provides that the right to self representation is absolute and shall not be denied.

15. When the defendant notified the court by motion that he desired to exercise his right to self representation, a hearing date should have been scheduled to determine if the defendant was capable of representing himself.

16. Pursuant to Rule 12 Del. Sup. Ct., all motions shall be delegated prior to the commencement of trial.

17. Once a defendant has expressed to the court his desire to invoke his right to self representation, that decision must be honored. Stigars V. State 674 A. 2d 477 (1996).

18. When this defendant notified the court pursuant to Rule 47 Del. Sup. Ct. rules, that he desired to proceed pro se', he should have been acknowledged.

19. When this defendants motion was not delegated prior to the commencement of trial, this was a violation of Rule 12 Del. Sup. Ct. rules.

20. When this defendant was not allowed to represent himself, this was a clear violation of his 6th Amendment right to self representation.

21. To support the claims in this motion, see attached exhibit.

Wherefore, this defendant respectfully request that a mistrial be ordered in this matter and that the defendant be allowed to exercise his right to self representation.

Sincerely,

Kevin C. Brathwaite

D.C.C.

Smyrna, Delaware

19977

~~Sworn to and subscribe this _____ day of _______ 199_~~

NOTARY

NOTICE OF SERVICE - DISCOVERY RESPONSE.

4 05/29/1996
AUTHORIZATION FOR EXTRADITION APPROVED WITHIN 250 MILES.

3 06/03/1996
RULE 9 WARRANT ISSUED.

7 06/17/1996
RULE 9 WARRANT RETURNED, BAIL SET AT_JP#18
HELD ON SECURED BAIL 150000.00 100
CONDITIONS: NO CONTACT WITH VICTIM
HRG.062596 AT 9:30

8 06/18/1996
MOTION FOR INCREASE OF BAIL FILED.
THOMA A. PEDERSEN, ESQ.

9 06/25/1996
ARRAIGNMENT CALENDAR - CONTROL FOR REPRESENTATION, DEFENDANT WAIVED READING OF INDICTMENT, PLEA OF NOT GUILTY ENTERED, JURY TRIAL DEMANDED
10C D FACCIOLO

11 06/26/1996 BARRON NORMAN A.
CASE REVIEW CALENDAR, CONTINUED.

10 06/27/1996
ARRAIGNMENT BY RULE 10C, DAVID FACCIOLO, ESQ.

12 07/09/1996 REYNOLDS MICHAEL P.
MOTION FOR INCREASE BAIL PASSED.
TIL 071696

13 07/16/1996 REYNOLDS MICHAEL P.
MOTION TO INCREASE BAIL DENIED.
IT IS HEREBY ORDERED, THE THE DEFT'S BAIL REMAIN AS PREVIOUSLY SET, BUT DEFT. SHALL NOT BE PERMITTED TO POST BAIL, UNLESS THE AMOUNT AND TERMS OF BAIL ARE REVIEWED BY THE ASSIGNED JUDGE

07/23/1996 BARRON NORMAN A.
CASE REVIEW CALENDAR CONTINUED 10/9/96 CONTROL

07/25/1996 BARRON NORMAN A.
CASE REVIEW CALENDAR CONTINUED CSO.

14 09/11/1996
SUBPOENA(S) MAILED.

15 10/09/1996 BARRON NORMAN A.
TRIAL CALENDAR, CONTINUED.

16 11/12/1996
REINDICTMENT - TRUE BILL FILED.

48 11/12/1996
CASE CONSOLIDATED WITH: 9510012606, 9511004047, 9601006324, 9606007786, AND 9607012270.

17 12/03/1996 REYNOLDS MICHAEL P.
ARRAIGNMENT CALENDAR, CONTINUED.

19 12/10/1996 REYNOLDS MICHAEL P.
ARRAIGNMENT CALENDAR, ARRAIGNED.

20 12/12/1996
MEMORANDUM FILED FROM DALE BROOME TO J.TOLIVER NOTIFYING HIM THIS CASE HAS BEEN ASSIGNED TO HIM.

18 12/2[illegible]/1996 REYNOLDS MICHAEL P.
ARRAIGNMENT CALENDAR, CONTINUED.

52 01/07/1997
DEFENDANT'S LETTER FILED. REQUESTING DOCKET SHEET.

21 01/29/1997
SUBPOENA(S) MAILED.

23 01/31/1997
DEFENDANT'S LETTER FILED.

22 02/05/1997
DEFENDANT'S LETTER FILED.
REFERRED TO COMMISSIONER REYNOLDS

24 02/12/1997 REYNOLDS MICHAEL P.
LETTER FROM COMM. MICHAEL REYNOLDS TO DAVID FACCIOLO FORWARDING A LETTER HE RECEIVED FROM THE DEFT.

25 02/24/1997 QUILLEN WILLIAM T.
TRIAL CALENDAR, CONTINUED.
050597

26 03/03/1997
DEFENDANT'S LETTER FILED.

27 03/03/1997
MOTION TO PROCEED PRO'SE FILED
PRO'SE - REFERRED TO JUDGE COOCH (COJ)

28 03/03/1997
MOTION FOR DISCOVERY FILED.
PRO'SE - REFERRED TO JUDGE COOCH (COJ)

29 03/06/1997
MOTION TO DISMISS FILED.
PRO'SE - REFERRED TO JUDGE COOCH (COJ)

30 03/07/1997 COOCH RICHARD R.
LETTER FROM J.COOCH TO DAVID FACCIOLO FORWARDING 3 DIFFERENT MOTIONS FILED BY THE DEFT.

31 03/10/1997
DEFENDANT'S LETTER FILED.

50 03/13/1997
DEFENDANT'S LETTER FILED.

51 03/18/1997
DEFENDANT'S LETTER FILED.

32 03/21/1997
MOTION TO PARTICIPATE W/COUNSEL IN THE DEFENSE
PRO'SE - REFERRED TO JUDGE ALFORD (COJ)

33 03/26/1997
MOTION FOR REDUCTION OF BAIL FILED.
DAVID J.J. FACCIOLO, ESQ.

34 03/27/1997 ALFORD HAILE L.
REFERRAL MEMORANDUM.
TO: DAVID FACCIOLO, ESQ.

35 03/27/1997
LETTER FROM MARY WILSON-DAWSON TO DAVID FACCIOLO AND THOMAS PEDERSEN NOTIFYING THEM OF A 12/30/96 9AM OFFICE CONFERENCE.

36 03/27/1997
MEMORANDUM FILED FROM DALE BROOME TO J.TOLIVER NOTIFYING HIM THIS CASE HAS BEEN ASSIGNED TO HIM.

37 04/08/1997 REYNOLDS MICHAEL P.
MOTION FOR REDUCTION OF BAIL DENIED.

38 04/11/1997
MOTION FOR REDUCTION OF BAIL FILED.
DAVID J.J. FACCIOLO, ESQ.

39 04/11/1997
SUBPOENA(S) MAILED.

53 04/16/1997
SUMMONS MAILED.

54 04/16/1997
SUMMONS MAILED.

45 04/22/1997 REYNOLDS MICHAEL P.
BAIL MODIFIED. BAIL NOW SET AT
HELD ON SECURED BAIL 30000.00 100
MOTION FOR REDUCTION OF BAIL GRANTED
W/CONDITIONS: 1. PRETRIAL SUPERVISION AT L-4, PENDING DISPOSITION OF CHARGES. 2. SUPERVISION AT L-5 UNTIL MONITORING DEVICE AVAILABLE. 3. ABIDE BY CURFEW DETERMINED BY HOME CONFINEMENT UNIT. 4. NO CONTACT W/VICTIMS, THEIR RESIDENCE OR EMPLOYMENT ("ZERO TOLERANCE"). 5. IF DEFT. VIOLATES ANY ASPECT OF PRETRIAL SUPERV. HIS BALL SHALL BE REVOKED AND HE IS TO BE REMANDED TO CUSTODY OF D.O.C. AND HELD ON $300,000.00 CASH ONLY BAIL.

40 04/25/1997
DEFENDANT'S LETTER FILED.

41 05/05/1997 COOCH RICHARD R.
TRIAL CALENDAR, CONTINUED.
051997

42 05/05/1997
CASE MANAGEMENT STATUS CONFERENCE WORKSHEET

43 05/06/1997
MEMORANDUM FILED.
FROM DEBORA BELL TO CASE PARTICIPANTS REGARDING CONSOLIDATION OF CHARGES.

44 05/13/1997
DEFENDANT'S LETTER FILED.
RE: ATTACHED COPY OF LETTER TO ATTORNEY.

54 05/14/1997
SUMMONS MAILED.

46 05/15/1997
DEFENDANT'S LETTER FILED.

47 05/15/1997
DEFENDANT'S LETTER FILED.

49 05/19/1997 CARPENTER WILLIAM C. JR.
CASE REVIEW CALENDAR, CONTINUED.
052797

55 05/22/1997 CARPENTER WILLIAM C. JR.
CASE REVIEW CALENDAR, CONTINUED.
052797

56 05/27/1997 GOLDSTEIN CARL
CASE REVIEW CALENDAR, CONTINUED.
SFT DATE NOT GIVEN

57 06/16/1997
MOTION FOR REDUCTION OF BAIL FILED.
DAVID J.J. FACCIOLO, ESQ.

59 06/24/1997 REYNOLDS MICHAEL P.
MOTION FOR REDUCTION OF BAIL DENIED.
HOWEVER, BAIL WAS RESET ON ALL CHARGES FOR A TOTAL OF $96,500 SECURED BAIL.

58 07/01/1997
MEMORANDUM FILED TO COUNSEL FROM DEBORA BELL, CHIEF DEPUTY PROTH.
ENCLOSING COPY OF BAIL SET OUT FOR EACH INDICTED CHARGE.
TOTAL BAIL IN CASE IS $212,000 SECURED. $24,500 HAS BEEN POSTED, SO DEFENDANT'S UNPOSTED BAIL IS $187,500.

60 07/07/1997
MEMORANDUM FILED TO COUNSEL FROM DEBORA BELL, CHIEF DEPUTY.
REGARDING MOTION TO REDUCE BAIL HEARD ON 6/24/97.

9500
25000
40000
69500

BAIL FOR THIS ENTIRE CASE IS NOW SET AT $96,500. OF THIS AMOUNT, $14,500 HAS BEEN POSTED. $82;000 REMAINS TO BE POSTED.

61 07/31/1997 CARPENTER WILLIAM C. JR.
ORDER SCHEDULING TRIAL FILED.
TRIAL DATE:NOVEMBER 4, 1997.
CASE CATEGORY: 1
ASSIGNED JUDGE (CATEGORY 1 CASES ONLY): JUDGE SILVERMAN.
UNLESS THE COURT IS ADVISED WITHIN 2 WEEKS OF THE UNAVAILABILITY OF NECESSARY WITNESSES, THE COURT WILL CONSIDER THE MATTER READY FOR TRIAL. ABSENT EXCEPTIONAL CIRCUMSTANCES, RESCHEDULING OR CONTINUANCE REQUESTS WILL BE DENIED.

62 08/07/1997 CARPENTER WILLIAM C. JR.
TO COUNSEL THOMAS PEDERSEN AND DAVID FACCIOLO.
RE: CRIMINAL CASE MANAGEMENT PROCEDURES REQUIRE ANY PRETRIAL MTNS. BE FILED W/I 2 WKS AFTER FIRST C/R.

63 08/15/1997
MOTION TO DISMISS FILED.
DAVID J.J. FACCIOLO, ESQ. - REFERRED TO JUDGE CARPENTER

64 08/15/1997
MOTION TO SEVER FILED.
DAVID J.J. FACCIOLO, ESQ. - REFERRED TO JUDGE CARPENTER

65 08/15/1997
MOTION TO COMPEL FILED.
DAVID J. J. FACCIOLO, ESQ. - REFERRED TO JUDGE CARPENTER

66 09/22/1997 CARPENTER WILLIAM C. JR.
ORDER SCHEDULING TRIAL FILED.
TRIAL DATE: JANUARY 13, 1997.
CASE CATEGORY: 1.
ASSIGNED JUDGE (CATEGORY 1 CASES ONLY): NORMAN A. BARRON.
UNLESS THE COURT IS ADVISED WITHIN 2 WEEKS OF THE UNAVAILABILITY OF NECESSARY WITNESSES, THE COURT WILL CONSIDER THE MATTER READY FOR TRIAL. ABSENT EXCEPTIONAL CIRCUMSTANCES, RESCHEDULING OR CONTINUANCE REQUESTS WILL BE DENIED.

67 11/18/1997 BARRON NORMAN A.
OFFICE CONFERENCE PROCEEDING HELD, RE: STATUS AND PENDING MOTIONS, THE DEADLINE FOR THE MOTION FOR SEVERENCE OF CHARGES AND THE MOTION TO DISMISS FOR LACK OF SPEEDY TRIAL IS 12/5/97. THE DEADLINE FOR THE DEFENSE TO REPLY TO MOTIONS IS 12/12/97.
(ORDERED BY JUDGE BARRON: 1) MOTION TO COMPEL IS GRANTED. 2) MOTION TO DISMISS AND MOTION TO SEVER: STATE TO RESPOND BY DECEMBER 5TH, DEFENSE TO REPLY BY DECEMBER 12TH. 3) DEFENDANT TO SUBMIT MOTION TO WITHDRAW WITH CAVEAT THAT MR. FACCIOLO WILL CONTINUE HIS REPRESENTATION UNTIL MOTIONS ARE DECIDED.)RE: THE MOTION TO COMPLY; THE STATE HAS TILL 12/12/97. TRIAL SCHEDULED FOR 1/13/98.

68 11/18/1997 BARRON NORMAN A.
ORDER: THE MOTION TO COMPEL DISCOVERY IS GRANTED IN SO FAR AS THE STATE IS ABLE TO COMPLY, WITH OR WITHOUT A COURT ORDER. COMPLIANCE MUST BE EFFECTUATED BY 12/5/97.

69 11/21/1997
RESPONSE TO DEFT'S MOTION FOR SEVERENCE. [illegible]
THOMAS A. PEDERSEN, ESQ. - REFERRED TO JUDGE BARRON.

70 12/03/1997
MOTION TO WITHDRAW AS COUNSEL FILED.
DAVID J.J. FACCIOLO, ESQ.

71 12/04/1997
STATE'S RESPONSE TO THE DEFT'S MOTION TO DISMISS

FOR LACK OF SPEEDY TRIAL, FAILURE TO PROSECUTE AND PROSECUTORIAL MANEUVERING. THOMAS PEDERSEN, ESQ. REFERRED TO JUDGE BARRON.

72 12/15/1997 BARRON NORMAN A.
ORDER: MOTION TO W/DRAW AS COUNSEL GRANTED W/OUT OPPOSITION FROM STATE. PROTHONOTARY (MARTY) TO APPOINT THOMAS FOLEY, ESQ. TO REPRESENT THE DEFT. FOR TRIAL PURPOSES. DEFT. AND CURRENT COUNSEL AGREE THAT CURRENT COUNSEL SHLL REPRESENT DEFT. WITH REGARD TO PENDING ITEMS BEFOR THE COURT.

73 12/22/1997 BARRON NORMAN A.
MEMORANDUM OPINION. (SUBMITTED 121297) (DECIDED 122297) UPON DEFT'S MOTION TO DISMISS, DENIED. UPON DEFT'S MOTION FOR SEVERANCE. DENIED IN PART; GRANTED IN PART.

74 12/22/1997
ACKNOWLEDGEMENT SIGNED BY COUNSEL. THOMAS A. FOLEY.

76 12/24/1997 COOCH RICHARD R.
LETTER FROM THOMAS A. FOLEY, TO JUDGE COOCH, RE: CONTINUANCE REQUEST FOR THIS CASE; GRANTED BY JUDGE COOCH.

77 12/24/1997 COOCH RICHARD R.
EMAIL FROM JUDGE COOCH TO COUNSEL; ERIN BOGGS, AND CISSY VAVALA, RE: IN RECEIPT OF MR. FOLEY'S LETTER REQUESTING CONTINUANCE, DOES THE STATGE HAVE ANY OBJECTION TO THE CONTNUANCE, AND THE SETTING OF A FINAL CASE REVIEW DATE IN FEBRUARY?

75 12/30/1997
SUBPOENA(S) MAILED.

78 01/06/1998
LETTER FROM THOMAS A. FOLEY TO JUDGE COOCH, REQUESTING A CONTINUANCE IN THIS CASE, AS HE HAS JUST RECEIVED NOTICE TODAY THAT HE IS COURT APPOINTED TO REPRESENT THIS DEFENDANT.

80 02/06/1998
BAIL POSTED IN THE AMOUNT OF $82,000.00 INT.FID.INS.CO.
NO CONTACT WITH VICTIM
CASALE POSTED AS TO COUNTS 4-6; PUGLIESE POSTED AS TO COUNTS
IT IS HEREBY ORDERED, THAT THE ABOVE CAPTIONED DEFENDANT'S B
AS PREVIOUSLY SET. BUT DEFENDANT SHALL NOT BE PERMITTED TO P
THE AMOUNT & TERMS OF BAIL ARE REVIEWED BY THE ASSIGNED JUDG
PRETRIAL SUPERVISION AT L-4 PENDING DISPOSITION OF CHARGES
SUPERVISION AT L-5 UNTIL MONITORING DEVICE AVAILABLE
ABIDE BY CURFEW DETERMINED BY HOME CONFINEMENT UNIT
NO CONTACT W/VICTIMS THEIR RESIDENCE OR EMPLOYMENT (ZERO TOL

79 02/09/1998 GOLDSTEIN CARL
CASE REVIEW CALENDAR RE: 030998 FOR FCR.

81 03/09/1998 COOCH RICHARD R.
FINAL CASE REVIEW: NO PLEA/SET FOR TRIAL
(CERT.ADDRESS)

82 04/03/1998 TOLIVER CHARLES H. IV
ORDER SCHEDULING TRIAL FILED.
TRIAL DATE: [illegible]
CASE CATEGORY:1
ASSIGNED JUDGE (CATEGORY 1 CASES ONLY):FRED S. SILVERMAN
UNLESS THE COURT IS ADVISED WITHIN 2 WEEKS OF THE UNAVAILABILITY OF NECESSARY WITNESSES, THE COURT WILL CONSIDER THE MATTER READY FOR TRIAL. ABSENT EXCEPTIONAL CIRCUMSTANCES, RESCHEDULING OR CONTINUANCE REQUESTS WILL BE DENIED.

83 08/06/1998
STATE'S WITNESS SUBPOENA ISSUED.

84 08/06/1998
SUBPOENA(S) MAILED

85 08/06/1998
SUBPOENA(S) MAILED.

08/11/1998
SHERIFF'S COSTS FOR SUBPOENAS DELIVERD.

08/11/1998
SHERIFF'S COSTS FOR SUBPOENAS DELIVERD.

08/11/1998
SHERIFF'S COSTS FOR SUBPOENAS DELIVERD.

08/18/1998
SHERIFF'S COSTS FOR SUBPOENAS DELIVERD.

08/18/1998
TRIAL CALENDAR-JURY TRIAL WENT TO TRIAL

Dear Judge Toliver,

My name is Sir Olden Hue Chapman, I am the first cousin of Salan "Melle" Chapman. I am writting this letter to let it be known to all that it concerns that Kevin Brathwaite is not guilty of the allegations brought against him by my cousin Melle. I know that she is my blood relative, but right is right and wrong is wrong. I cannot just ignore this situation and let this man be punished for a crime he did not commit.

I know for a fact that Kevin Brathwaite and my Cousin Salan Melle Chapman were intimately involved from the summer of 1995

and January of 1996. There were at least three separate occassions between the summer of 1995 and January of 1996, that I went to Kevin Brathwaite's apartment at 1401 Maryland Ave., and when I Knocked at the door, my cousin Melle had answered the door wearing only a night-gown. From her appearance I could tell she had just gotten out of bed.

There had also been times when I would call Kevin at his apartment in the middle of the night, and my Cousin Melle would answer the phone. So when she says her and Kevin were never intimately involved, she is blatantly and absolutely telling a lie. I never believed it would go this far, so it would be an injustice for this man

to go to jail, without the truth being known! So if there is any way I can be of some assistance to be sure that justice is rightfully delegated, please let me know. I can be contacted at this address;

Sir Olden Hue Chapman
13 meadow brooke Ave
Wilmington, DE. 19804
Phone # (302) 993-0331

Graciously,

Sir Olden Hue Chapman

9/8/98
Notary Public
Comm's Expires March 12, 1999

Date

To: The Honorable Judge Toliver

from: Mr. Jackie Jones

RE: Mr. Kevin Brathwaite

Dear Sir,

this letter is in regards to the trial that commenced on Aug. 18th 1998. I recieved a subpoena to give testimony in regards to the Knowledge that I have about the allegations against Kevin Brathwaite. I Know for a fact that my testimony would have totally disputed Shane Osburns allegations.

I appeared in court everyday of the trial as ordered, But I was repeatedly told by Kevin's attorney that my testimony was not needed. I don't understand why Kevins to be heard, and I truly feel that intervention should be applied. Because as it stands now this clearly shows a lack of interest in Kevin innocense by his attorney.

Your Honor, Kevin is a lay person and totally put his trust and Faith in his attorney. I am requesting that this matter be reviewed and the wrong be corrected. Kevin's attorney told him that I refused to testify and that was a blatant lie.

Thank you for you time and attention in this very urgent matter. Respectfully Mr. Jackie L. Jones Jr.

To: Judge Toliver
From: Romayne Jackson
Re: Brathwaite

Dear Judge Toliver,

I talked to the attorney that represented Kevin Brathwaite at his trial. I told him that I was aqainted and did know Shana Osburn and that she is a master of manipulation and she is not to be trusted. I also told Mr. Brathwaites attorney that I have first hand information that I have also come to know that Shana Osburn concocted this whole story about Kevin to get back at him. If I were to be heard, I would have cleared Kevin Brathwaite of these charges. So If there is anything you can do to correct this situatio I am still willing to be heard.

Thank you in advance for your time and cooperation in this matter. I await to hear from you.

Respectfully,

Romayne Jackson

Romayne Jackson

I.D.

Dear Judge Toliver, 9-2-98

My name is Cassandra Moore. The reason I am writing you this letter is because I am really Concerned about the wrong doings that are continuously being permitted to take place in our justice system.

I talked to Thomas Foley on the phone regarding Salan "melle" Chapman and Kevin Brathwaite I am sure that I told Mr. Foley that I called Kevin's house on two separate occassions and Salan answered the phone and was very agitated that another female was Calling Kevin at home. She then proceeded to Curse at me and told me never to Call Kevin again. I also have knowledge of Kevin Brathwaite attempting to file charges against Salan Chapman for continuously following him around and harrassing him. But when he went to municipal Court to file charges against her, he was refused because he didn't know her date of birth. I was more

than willing to testify at Mr. Brathwaites trial. I also feel that if I had been subpoenaed to testify at Mr. Brathwaites trial, I am sure that the truth would have been revealed.

Your Honor, If there is any way that I can be of some assistance to right the wrong that has been done, Please Contact me at home, I will be more than happy to Cooperate.

Phone # 302-764-7855

Sincerely

Cassandra Moore

RONALD F. BASARA
NOTARY PUBLIC-DELAWARE
My Commission Expires Dec. 31, 2000

# AFFIDAVIT OF MAILING

STATE OF DELAWARE)
NEW CASTLE COUNTY)

I, Kevin Brathwaite, hereby certify that I have served a true and correct copies of the attached Motion For Mistrial upon the following parties/person(s):

TO: Judge Toliver
Superior Court
1020 King St.
Wilmington DE.

TO: Thomas Pederson
820 French St
Wilmington De.
19801

TO: Thomas Foley
1326 King St
Wilmington De.
19801

TO: Dianne Wilkerson
State house
Boston MA.
02110

By placing same in a sealed enveloped and depositing same in the United States Mail at the Multi-Purpose Criminal Justice Facility, 1301 East 12th Street, Wilmington, Delaware, 19809, postage prepaid by the Department of Corrections.

I Declare under the penalty of perjury that the foregoing is true and correct this 29th day of September, 1999.

[signature]

~~M.P.C.J.F.~~
~~1301 East 12th Street~~
~~Wilmington, Del. 19809~~
P.O. Box 500
Smyrna De
19977

THOMAS A. FOLEY
ATTORNEY AT LAW
1326 KING STREET
WILMINGTON, DELAWARE 19801

ADMITTED IN DELAWARE
AND THE DISTRICT OF COLUMBIA

TEL. (302) 658-3077
FAX (302) 656-1993

December 7, 1998

Mr. Kevin Brathwaite, Inmate
Delaware Correctional Center
Smyrna Landing Road
Smyrna, Delaware 19977

Dear Kevin:

As you know, the Court sentenced you to life in prison, which we knew was already coming, based upon the jury's verdict.

Within 30 days, I will file a Notice of Appeal to the Delaware Supreme Court, directing that they order that transcripts be generated for the Appeal. It will take the Court Reporters approximately 60 - 90 days to generate transcripts.

Once the record is complete, The Delaware Supreme Court will set up a Briefing Schedule. I will send you a copy of the transcripts, at that juncture, and entertain any input you want to provide regarding appellate issues.

So long as I am your lawyer, I will ultimately decide which issues will be raised on appeal. I want you to know that I have no intention of raising on appeal, the issue about whether the Court erred in not allowing you to represent yourself, and/or participate as co-counsel. In my mind, that issue was waived, by allowing me to represent you as your counsel.

Even assuming that the issue was not waived, I cannot raise that issue, since I am your counsel, and consequently, lack standing to raise that particular issue.

Consequently, you can either represent yourself on Direct Appeal, which I do not recommend, or alternatively, let me represent you on Direct Appeal. In the event your convictions are affirmed, you will still have the opportunity, via Rule 61, raise that issue in seeking Postconviction Relief.

In other words, the issue is preserved. It is simply an issue that I am not going to raise on Direct Appeal because I was your counsel, and it would not make sense for me to argue that the Trial Court erred in not allowing you to represent yourself.

In the event you feel more comfortable representing yourself on Direct Appeal, please advise.

Under any scenario, the Direct Appeal process will take approximately 9-12 months. If we lose the Appeal, you will have 3 years from that date, to file for Postconviction Relief under Rule 61.

Sincerely,

TAF

Thomas A. Foley

TAF:mdf

EXHIBIT - B.

July, 19, 2005

TO: The Honorable Charles H. Toliver ~~IV~~

From: Kevin C. Brathwaite

RE: your letter to Supreme Court No. 169, 2003 (Cr. I.D. No. 9510007098) 06cv472

FILED
AUG - 8 2006
U.S. DISTRICT COURT DISTRICT OF DELAWARE

Dear Judge Toliver,

IN the letters that you wrote to MS. Webb, the chief Deputy Clerk, of the Delaware Supreme Court, dated July, 5th, 2005 and July, 6th, 2005. You stated, that I did not tell you as a trial judge, that I wanted to proceed pro se. I am in possession of two identical letters that I wrote to you and Judge Cooch, regarding the problems that I was having with MR. Facciolo. IN those letters I mentioned the fact that I did file a motion to proceed pro se. These letters may have been overlooked because the date on

With the docket entry date. But these letters were filed with the Court through the pruthonotary's office, (Ms. Mary Elizabeth Pitcavage) Letters enclosed. I also have enclosed two (2) pages from the original police reports that should have been added to your file. These documents will clearly contradict the accusers sisters statement in the transcripts that you sent to Ms. Webb. Carmen Chapman stated that she had never been to my apartment, and her sister admits that they came to my apartment together. I hope these documents and letters can assist you with your report.

Thank you for your time and attention to this matter.

Sincerely

[signature]

C.C. Deborah L. Webb, clerk
Gregory E. Smith, Esq.
File

STATEMENT/SALAN CHAPMAN
CASE NO. 96-883
PAGE 3

A8    Well me and my sister, we, you know both of us introduced ourselves to each other.

Q9    Oh, I mean neither one of you had known him previously?

A9    No, unh unh.

Q10    You had just met him that day?

A10    Um hum.

Q11    This was just a couple of weeks ago?

A11    Two months, um hum.

Q12    Oh, two months ago?

A12    Um hum.

Q13    Okay, has he been...

A13    Talking to him?

Q14    Yeah.

A14    On the phone, we haven't...

Q15    You haven't been out with him or nothing like that?

A15    No.

Q16    Okay.

A16    We hadn't gone out or nothing.  Me and my sister had went to his house before, but I took my sister with me.

Q17    Okay.

A17    (CU) (CU).

Q18 What, did he call you up and asked you if you wanted to come over?

A18 Um hum.

Q19 Just to talk or...

A19 Nah, he was just ah asking us was...asking me well who was I with and I said, "My sister." He said, "Won't you all stop on in," and you know.

Q20 When was that? When was that time that you stopped by there?

A20 Around about two weeks ago I guess maybe three weeks. I don't know I can't really remember.

Q21 You had only ever been to his place one other time?

A21 Yeah.

Q22 Okay and that time you went there with your sister, did you go inside?

A22 Yeah, we went inside. Both of us, yeah.

Q23 He's in apartment building?

A23 Um hum.

Q24 Oh, he is, do you know what apartment's his in?

A24 "B."

Q25 "B?"

A25 The other officer told me the address is 14 or whatever, but I came to 403.

Q26 Okay.

A26 But he said it's probably 1403.

Q27 Okay and the apartment was?

5-19-97

TO: MARY Elizabeth Pitcavage

FROM: KEVIN BRAthwaite

RE: letter to Judges

MS. Pitcavage,

ENClosed For Filing please find two letters. ONE For Judge Toliver AND ONE For Judge Cooch, requesting to have my Attorney removed from my CASE.

Thanking you in Advance for your time AND Attention to the matter

Sincerly

[signature]

May, 19, 1997

To: Judge Toliver

From: Kevin Brathwaite

Dear Sir,

I Am writing you this letter requesting that you remove David Facciolo from my case. This is not the first time I am making this request. I have Already filed motions requesting to Act As A Pro se defendant. I have Also written David Facciolo numerous letters requesting that he remove himself from my case. My motions were reviewed and passed on to David Facciolo. He is not Acting in my best interest and he is blatantly misrepresenting me. My cases have been Scheduled for trial on six (6) different dates, and each time my trial has been continued for lack of the prosecutors preparation, and David Facciolo refuses to file the motions necessary to secure my release. On May, 5, 1997 I had A trial date which was suppose to be used As A final case review. This date was continued until May, 19, 1997. On May, 19, 1997 I was transported to Court from Gander Hill, only to be lied to by David Facciolo And

taken back to Gander Hill. It was brought to my attention, that under the New System the court uses, I was suppose to have been brought up to see the Judge to have a court date set. The prosecutor is using these false charges against me, just to hold me in jail, and David Facciolo knows this. I gave David Facciolo a list of witnesses back in July of 1996 and he has not attempted to make contact with any of my witnesses. This blatant disregard for my rights has been ongoing since Sept, 1995 your Honor, I am 100% sure that I will be better off without David Facciolo. Because as it stands now, it seems as though I have two prosecutors plotting against me. He did not even have the common courtesy to tell me when my next court date is. He continuosly makes excuses for the prosecutor and he has not filed any relevent motions in my behalf. So I am requesting once again your Honor, to be brought into court at your earliest convenienc[e] to have this very serious problem addresse[d]. I am desparately hoping to receive a response from you in this matter. I have exhausted all other avenues of relief and if this problem goes

Any further without being resolved, It will be totally impossible for me to receive A fair trial.

Thank you for your time And Attention to this very important matter.

Sincerly

[signature]

c.c. Judge Cooch
David Facciolo
Sen Dianne Wilkerson
prothonotary

May, 19, 1997

To: Judge Cooch

From: Kevin Brathwaite

Dear Sir,

I Am writing you this letter requesting that you remove David Facciolo from my case. This is not the First time I Am making this request. I have Already filed motions requesting to Act As A Pro se defendant. I have Also written David Facciolo numerous letters requesting that he remove himself from my case. My motions were reviewed and passed on to David Facciolo. He is not Acting in my best interest And he is blatantly misrepresenting me. My cases have been scheduled for trial on six (6) different dates, And each time my trial has been continued for lack of the prosecutors preparation, And David Facciolo refuses to file the motions necessary to secure my release. On May, 5, 1997 I had A trial date which was suppose to be used As A final case review. This date was continued until May, 19, 1997. On May, 19, 199[illegible] I was transported to Court from Gander Hill, only to be lied to by David Facciolo And

taken back to Gander Hill. It was brought to my attention, that under the New System the court uses, I was suppose to have been brought up to see the Judge to have a court date set. The prosecutor is using these false charges against me, just to hold me in jail, and David Facciolo knows this. I gave David Facciolo a list of witnesses back in July of 1996 and he has not attempted to make contact with any of my witnesses. This blatant disregard for my rights has been ongoing since Sept, 1995 your Honor, I am 100% sure that I will be better off without David Facciolo. Because as it stands now, it seems as though I have two prosecutors plotting against me. He did not even have the common courtesy to tell me when my next court date is. He continuosly makes excuses for the prosecutor and he has not filed any relevent motion's in my behalf. So I am requesting once again your Honor, to be brought into court at your earliest convenienc to have this very serious problem addresse I am desparately hoping to receive a response from you in this matter. I have exhausted all other avenues of relief and if this problem goes

Any further without being resolved, It will be totally impossible for me to receive A fair trial.

Thank you for your time and Attention to this very important matter.

Sincerly

[signature]

C.C. Judge Couch
David Facciolo
Sen Dianne Wilkerson
prothonotary

EXHIBIT - C 06cv472

MR. ROBERTS: Thank you.

THE COURT: Who is next?

MR. ROBERTS: I realize we're jumping all over, but she was actually the State's witness. I think the defense is still up to bat, so to speak.

MR. CAPONE: Could I go outside and see if any of the witnesses are here?

THE COURT: Yes.

MR. ROBERTS: While he's doing that, may I say hello to someone in the courtroom?

THE COURT: Okay.

MR. CAPONE: I'm going to call Captain Belanger now.

CAPTAIN JOSEPH H. BELANGER, having been called on the part and behalf of the State as a witness, being first duly sworn under oath, testified as follows:

DIRECT EXAMINATION

BY MR. CAPONE:

Q. Captain Belanger, I understand you're employed by the Department of Corrections. How long have you been employed by the Department of Corrections?

A. A little over 22 years.

Q. And what building are you currently assigned to?

A. I currently supervise in the Security Housing Unit.

Q. How long have you held that position?

A. Since the opening, December of 2000.

Q. Are you familiar with my client, Mr. Brathwaite?

A. Yes, I am.

Q. Is he housed in your unit?

A. Yes, he is.

Q. And that unit is in Smyrna, correct?

A. That's correct.

Q. Now, have you ever had the occasion to confiscate property belonging to him from his cell?

A. On a few occasions, yes.

Q. Can you tell us why you have confiscated property from him?

A. Why?

Q. Yes.

A. Various reasons. First case that I can recall involved a pair of tennis shoes that an inmate,

FILED AUG - 8 2006 U.S. DISTRICT COURT DISTRICT OF DELAWARE

I believe Alfred Robinson, claimed in fact was his, loaned to Mr. Brathwaite in a transaction that was illicit for the Department of Corrections, so those tennis shoes were confiscated.

Q. That's one item. Can you tell me other times you confiscated property from him?

A. Specifically, I can recall that in another instance, there was some papers, letters, pictures. Without looking at the reports, specifically, I can't recall exactly what other items were taken, but I do recall there was some other items that were taken.

Q. Well, you do recall pictures were taken?

A. Yes.

Q. And you do recall that they were Polaroid pictures of a naked woman?

A. I don't recall the specific pictures. I don't generally look at the pictures. We have a limited quantity that the inmates are permitted to have. I am interested in the quantity, and then anything above and beyond that.

Q. Well, what happened to the pictures that you confiscated?

A. I attempted to afford Mr. Brathwaite the

opportunity to have those pictures sent out. He refused, so it was confiscated. If memory serves me correctly, I think they were placed in a box and then sent to the property room.

Q. All right. Now, you know that I subpoenaed, the last time we had a hearing, I subpoenaed you to appear and bring everything that you ever confiscated, including pictures?

A. I was not aware of that.

Q. Well, are you unaware of that today, I mean, that I really wanted you to come and bring pictures?

A. I received a subpoena. It wasn't specific.

Q. Okay. This subpoena required you to bring all documents and pictures that were confiscated from him.

MR. ROBERTS: Your Honor, the Department of Correction is represented by Mr. Drowos. When Mr. Capone sends a subpoena for the Department of Correction employees or Department of Correction materials that are seized, it should be served on Mr. Drowos. That may be the confusion, why it didn't happen with Captain Belanger the last time.

In addition, Mr. Drowos has already made a

EXHIBIT-C

record that Captain Belanger turned those items over to him, and he can't find them in his office right now. If we're going down the road of where is this stuff at, I think that that record is already before the Court, and Mr. Capone is aware of it.

MR. CAPONE: He's just heard what Mr. Drowos has testified about. I thought that's why we sequestered witnesses.

THE COURT: I'm not --

THE WITNESS: If it may satisfy the Court, I can establish the procedures of contraband confiscation.

THE COURT: Is there anything else left is what I -- we want to know. Do you have everything --

THE WITNESS: No. Everything that was confiscated in question was turned over to the Attorney General's Office.

BY MR. CAPONE:

Q. Can you tell me how you sent this to the Attorney General's Office?

A. I exactly don't recall. I do recall after the last instance, where I wasn't served the subpoena in time for me to make the last appearance, I had done

some questioning as to what was the subpoena concerning with, through Francene Kobus, who is our legal services administrator.

She had made contact with the AG's office and suggested that I take the items that were in question and turn them over to the AG's office, which is, in fact, what happened.

Q. So you personally delivered them to the Attorney General's Office?

A. I didn't bring them up here. I don't recall exactly how they were handed over.

Q. Okay. Did you put them in a box?

A. They were in a box, yes.

Q. So it was enough material to be delivered in a box?

A. There was not a large amount of material, no.

Q. How big was the box?

A. The size of the box is coinciding with what inmates are issued.

Q. But I don't know what that is, so how big was the box?

THE COURT: About like this?

A. No, about this wide and this high.

Q. You're holding your hands about 12 feet wide and about 18 inches high?

A. And maybe about that wide.

Q. Maybe 18 inches by 18 inches?

A. The amount of material that was in the box was across the bottom. It was probably no more thick than that.

Q. About an inch thick across the bottom of the box?

A. Plus or minus.

Q. And it was all pictures and correspondence, papers?

A. If I had an opportunity to review the records, I could be more specific. I can't say exactly, quantitatively, whether it was one picture, 100 pictures, one letter, 100 letters.

Q. Now, were you involved in a shakedown of Mr. Brathwaite Friday morning?

MR. ROBERTS: Object to the term.

THE COURT: It's only me, Mr. Roberts.

MR. ROBERTS: I understand that it's you, Your Honor, but I think Mr. Capone is trying to perhaps rattle Captain Belanger a little bit by his

use of terminology. If Captain Belanger wants to adopt that term, that's fine, but for now I think it should be called a search or review for more contraband material or something a little less --

THE COURT: With all due respect to your objection, I think Captain Belanger has been there 22 years, and with respect to Mr. Capone, I think it would take a little bit more than Mr. Capone and a coat and tie in a courtroom to really, quote, unquote, rattle the Captain, but the use of the word "shakedown" is not objectionable.

BY MR. CAPONE:

Q. Did I confuse you by the use of the word "shakedown"?

A. No, sir.

Q. Did you instruct any officers or were you involved in a shakedown that occurred Friday and again this morning of Mr. Brathwaite?

A. Friday?

Q. Yes.

A. This past Friday>

Q. Yes.

A. Yes, I did.

Q. Can you tell us what the reason for that was?

THE WITNESS: Can I consult with Your Honor?

THE COURT: I'm afraid that you're going to have to --

THE WITNESS: The reason for this is because --

MR. ROBERTS: Hold on. I have a problem. All right. I have a thought that there may be a governmental privilege here, and that might be what Captain Belanger doesn't want to disclose.

THE COURT: If it is a situation, and I don't know --

THE WITNESS: The relevance is not pertaining to this case, sir.

THE COURT: I think what we have to determine is if it's a question of you received information that there was contraband or allegedly contraband in his cell -- I'm not sure Mr. Capone is seeking anything more than that -- or if there was some other reason or, that he had possession of contraband, I don't know, whatever generically justifies an intrusion into an inmate's cell. Is that where we're going with this? Without saying the specific reasons.



THE WITNESS: It's due to an ongoing investigation. Is that adequate?

THE COURT: Some alleged illegality or something contrary --

THE DEFENDANT: Yes, concerning an alleged illegality concerning contraband.

BY MR. CAPONE:

Q. So part of an investigation was the reason for the search?

A. That's correct.

Q. How about this morning?

A. I'm not aware of any shakedowns this morning.

Q. Did you see Mr. Brathwaite this morning before he left for court, the courthouse?

A. No.

MR. CAPONE: One moment, Your Honor.

BY MR. CAPONE:

Q. Were you in the building where Mr. Brathwaite was housed this morning?

A. Yes, sir, I was.

Excuse me. Can you rephrase the question?

Q. Were you in the building where he's housed this morning?



A. No, I was not.

MR. CAPONE: One more minute, Your Honor.

BY MR. CAPONE:

Q. When prisoners are being taken to court, are they brought to another building in a holding cell?

A. Yes. There is an area where the inmates are held until Court Transportation picks them up.

Q. Is that in your building?

A. The location of that area is across from -- a controlled center across from where my office is located.

Q. Does that mean it's in your building or not?

A. Yes.

Q. Yes?

A. The same building where my office is located.

Q. Did you see him being held in a holding cell this morning?

A. No, I did not.

Q. Did you speak to Major Cunningham regarding --

A. No. I was in and out of the facility before he arrived.

Can I clear the picture on that issue?



Q. Yeah.

A. The purpose for me reporting to my office this morning was to see if, in fact, I had to report here today. I had another obligation I was to make. And this one here, obviously, superseded the other obligation. I was just trying to figure out which way I had to go. And that was through e-mail through Francene Kobus.

MR. CAPONE: Can I have one more minute, Your Honor?

THE COURT: Yes.

BY MR. CAPONE:

Q. Captain Belanger, while you were employed last year at the Department of Corrections, were you on Level IV probation?

A. No.

THE COURT: As in SENTAC Level IV?

MR. CAPONE: Yes, Your Honor.

THE WITNESS: Can I clarify the issue on that?

MR. CAPONE: Sure.

THE WITNESS: There have been several rumors in the air by most of the inmates for quite a few years.

MR. CAPONE: Okay.

MR. ROBERTS: Whole different world down there than out here.

THE WITNESS: Yes, it is.

MR. ROBERTS: I was expecting somebody about 10 foot tall and 400 pounds from the things I've heard about you.

THE COURT: You're not making derogatory comments about vertically challenged people.

MR. ROBERTS: As I look around the courtroom, maybe I am.

THE COURT: I don't think that would be wise

CROSS EXAMINATION

BY MR. ROBERTS:

Q. Did you seize a photo album from the defendant on this occasion when you sent materials to the Attorney General's Office?

A. I don't recall a photo album. I do recall pictures.

Q. Let me back up for a second too. Do you know who I am?

A. No, sir.

Q. Have you and I ever spoke?

A. Not to my recollection.

Q. Do you remember sending some e-mails to Francene Kobus in the last couple of days about wondering whether you should appear or not?

A. Yes, sir, I do.

Q. Did you receive from Francene an e-mail from a Deputy Attorney General Roberts that said, "I don't want to discuss the case with Captain Belanger so that he doesn't appear influenced"?

A. Yes, sir, I do.

Q. Okay. I'm that Deputy Attorney General. So is it fair to say we've never had any conversation on this?

A. Yes, sir.

Q. You had to report in this morning, and you supervise the Security Housing Unit?

A. Yes, that's correct.

Q. Is that the worst of the worst?

A. Yes, it is.

Q. And among the worst of the worst is Mr. Brathwaite?

A. He's one of the residents.

Q. Is he, in terms of the correctional officers

and administration, a pain in the butt?

A. He's at times projected behavior issues.

Q. Is he constantly filing grievances?

A. For different issues, yes, he is.

Q. Does he seem to have a problem with you?

A. I get the impression from some of the grievances and lawsuits that I have read previously that he's issued on me, yes.

Q. While you were down there this morning checking in to determine whether or not you had to come here to this hearing today, do you know who else was transferred out of Security Housing this morning with him?

A. No, I do not.

Q. Are you aware of any trials going on up here with some rather notorious individuals?

A. No, sir, I do not.

MR. ROBERTS: Thank you. I have nothing further.

THE COURT: I'm just curious. How can you work for the Department of Corrections and be on Level IV probation?

MR. ROBERTS: He's not.

THE WITNESS: I'm not.

THE COURT: It's not possible, is it?

THE WITNESS: Not that I'm aware of.

MR. ROBERTS: He could supervise himself. That would be easy, Judge.

THE COURT: I've heard a lot in twelve years. I never heard that one before.

MR. ROBERTS: To make Level IV, you would have to be a convicted felon. If he was a convicted felon, he wouldn't be carrying a firearm and wouldn't be supervising the worst of the worst.

THE COURT: I'm just trying to understand that.

MR. ROBERTS: Much of the case is all about that.

THE COURT: Do you have anything further? Take your time.

MR. CAPONE: I'm consulting, Your Honor, thank you.

THE WITNESS: Am I excused?

THE COURT: Not yet.

MR. CAPONE: I don't have any questions for him. As far as I'm concerned, he can be excused.

EXHIBIT - D

06cv472

double-underlines. On Page 28, for emphasis, he double-underlines. Page 31 and Page 33 both contain double-underlining for emphasis, much as in the questioned document.

MR. CAPONE: Your Honor, could I just respond to that?

THE COURT: Sure.

MR. CAPONE: I don't object to these documents becoming a Court record. This is the type of thing that I think requires expert testimony to see whether or not --

THE COURT: I was getting ready to say, I don't doubt what Mr. Roberts said, as a matter of fact, but, I mean, he's saying it to me, a history major who sits on the bench. I have seen handwriting experts, but obviously, I am not one.

MR. CAPONE: So I don't think that you can draw any conclusions about the similarity or not or whether it was written by the same person, but I have no objection to these documents.

MR. ROBERTS: And that wasn't the point I was making. I was pointing out the similarity in style of when Mr. Brathwaite emphasizes things, he

double-underlines it, much like the questioned document. I don't purport to be a handwriting expert.

THE COURT: I will have these 19 pages, however many of them there are -- What I'm going to do, these letters, I'm going to mark in my own hand and initial a number on each one, and that way we'll know how many are going to be marked.

You want to call Miss Chapman?

MR. ROBERTS: Yes.

THE COURT: Mr. Drowos is here.

MR. DROWOS: Excuse me, Your Honor. I'm sorry. My deepest apologies to the Court for the delay.

I assume this is in reference to the documentation that had been submitted by Captain Belanger.

And as I had indicated to the Court last week and also Mr. Roberts and Mr. Capone in phone calls and e-mails, I had indicated that during my absence from the office as a result of an illness, the paralegals and secretary apparently had gone into the office and moved some of my files and taken some of those things out so that other deputies could work on them during

FILED AUG - 8 2006 U.S. DISTRICT COURT DISTRICT OF DELAWARE

my absence.

When I found out after I got back about the hearing scheduled for today, I went to look for the file where the envelope was that contained the documentation sent to me by Captain Belanger, and I could not locate it. And I have been searching for it, but to date, have not been able to locate it.

It could be in a number of files, conceivably, and I, unfortunately, and I apologize to the Court and the parties, I cannot locate it at this time. It was correspondence, from what I recall Captain Belanger telling me. I did not read the documentation.

I did send a letter to the Court, I believe it was in November of last year when this matter was first able to be heard, and indicated at that time that if the Court would advise us to when the next scheduled hearing date would be, in the meantime, we would keep that in the office and keep it secure.

It is still within the confines of the office. Unfortunately, I have not yet been able to physically locate it. My apologies to the Court with regards to that.

When I spoke with your secretary yesterday, with Lori, again, because she had said that she would speak with you on Monday and advise as to what the Court's pleasure was with regard to the hearing going forward or having it continued, she said that she would get back to me. I didn't hear from her.

Toward the latter part of the day, I called her again, and she told me that after consultation with Your Honor, that a decision was made to go forward.

I notified my client, Captain Belanger, to make sure that he appeared today, and if he should have had any copies of the documents, that he should bring those with him. So the e-mail that came back to me from the paralegal supports from the office down there indicated he did not have any copies, but would honor the subpoena and be here to testify today at the Court's pleasure and the pleasure of the parties.

As a matter of fact, I was out in the hallway looking for him, and I saw him briefly when I came in, and I am not certain where he is right now. He may have gone down to make a phone call because he was scheduled, as I indicated to Lori yesterday also, he

had some mandatory training in Dover today that had been scheduled prior to this hearing date, and he was hopefully going to be able to be in and out fairly quickly this morning if, in fact, we might have went forward.

And as I said, I was not able to get ahold of him before he left his shift late yesterday afternoon, so I sent him an e-mail to advise him that he was supposed to come in today to honor the subpoena.

And as a result of my illness from back in February, I have only been coming in part time during the day, so I was not aware that, A, my presence would be required and there would be a delay for this proceeding; and second of all, I was under the impression that this matter wouldn't initially go forward -- it was presumptuous on my part -- and would rather be continued. It was presumptuous on my part.

And when I heard it was going to be continued, I thought the only thing that Captain Belanger would be able to do is testify to whatever acts Mr. Brathwaite may have alleged that he committed in the performance of his duties, and whatever documentation he may have had at that point in time.

That would be basically the result of -- the sum total of whatever testimony might be elicited from him, and that was basically it.

Again, my apologies to the Court for today's delay and also for the misplacement thus far of the documentation in question.

THE COURT: Thank you, Mr. Drowos, for coming in, and I understand that you have been ill. I just needed to make sure that we put that on the record.

Do either one of you want Mr. Drowos?

MR. CAPONE: I'm going to have to ask him a few questions.

THE COURT: You want to put him on now or will that disrupt the order?

MR. CAPONE: Mr. Roberts, would you have a problem? I'd like to question him now. He's here. We might as well get him over with.

THE COURT: He's a member of the Bar and does not need to be sworn.

STUART DROWOS, ESQUIRE, having been called on the part and behalf of the Defendant as a witness, testified as follows:

DIRECT EXAMINATION

BY MR. CAPONE:

Q. Mr. Drowos, can you recall when you first heard that Captain Belanger was confiscating materials related to Mr. Brathwaite?

A. It would have been probably the very early fall, I believe, if memory serves me. I think it was sometime around October.

Q. Was it prior to the last hearing that we had in this case? You know that we've already had one hearing back in November, I believe?

A. I was not aware that there was a hearing in November. It would have been prior to that, because if my memory serves me, I had sent a letter to, I believe, yourself as well as Mr. Roberts and the Court indicating that there had been -- My understanding was that there was to be a hearing scheduled and that I was going to retain the documentation until such time, and I would be -- I had asked the Court to indulge me and advise me as to when the next hearing would be. I was not aware whether any further hearings had gone forward.

Q. So this came to your attention as a result --

MR. CAPONE: Can I ask that the Captain

Belanger be sequestered?

THE COURT: We'll be with you in just a few minutes, Captain.

BY MR. CAPONE:

Q. So you became aware of this because a subpoena was received by Captain Belanger?

A. I believe that's how it came about.

Q. And did you have a discussion with Captain Belanger about what he had been confiscating or did he just deliver materials to you?

A. My recollection is he indicated to me that there was correspondence in excess of what's permitted in a prisoner's cell, and as a result of that, it had been confiscated as non-dangerous contraband.

Q. Is it the responsibility of the Department of Corrections in these cases to maintain the property or correspondence that they confiscate?

A. Normally what would happen is that if there was an excess of materials, be it legal materials as well as non-legal materials, the individual is advised to, before anything is confiscated, is advised it has to be sent out; that only so much can be retained.

And after some time, if the individual inmate

fails to adhere to that particular policy from the DOC, then if there is a subsequent either shakedown or if there is a subsequent inspection of the cell and the excess material is found, at that point, it can be confiscated. And at that point, it may, in fact, be offered to the inmate to exchange it for other materials or to have it sent out.

Q. Is it ever destroyed?

A. To the best of my recollection, no.

Q. So then it would be saved by the Department of Corrections, whatever they confiscated?

A. Well, it normally would be. There are limitations as far as storage is concerned at the facility itself.

Q. Now, were you aware that anything other than correspondence was confiscated?

A. To the best of my knowledge, no.

Q. Did you ever see what was sent to you by Captain Belanger?

A. I saw some of the envelopes that some of the documentation was in, but did not look in or try to determine what the substance of these documents would be.

Q. So you don't know if there were photographs in there or not?

A. My recollection is that -- and again, this is going back six or seven months, but my recollection is that this was only correspondence; there were no photographs.

Q. And that recollection is based upon --

A. Not looking directly in the envelope, but when I would put it into a subsequent manila folder, I couldn't detect from my feel what would be photographic paper or anything that would be out of the ordinary as far as photographs are concerned.

Q. Can you tell me -- I know you didn't open up the envelopes -- how many envelopes you received? Were they 8-1/2-by-11 envelopes or letter-sized?

A. Letter-sized. And as far as the number is concerned, I really don't recall offhand. I would imagine it was in excess of ten, but I honestly don't recall the number.

Q. Were they thick envelopes? Did they have some heft to them, or appear to be --

A. Appeared to be normal, maybe two-sheet type of things, as far as a regular letter might be

concerned.

Q. And do you recall when the last time was that you received any documents from Captain Belanger, documents which were purportedly confiscated from Mr. Brathwaite?

A. That would have been, again, the latter part of or the early part of the fall, rather, sometime prior to my correspondence to the Court and to the parties in November.

MR. CAPONE: Can I have a moment, please, Your Honor?

THE COURT: Yes, sir.

BY MR. CAPONE:

Q. Did you ever receive a photo album from Captain Belanger that purportedly belonged to Mr. Brathwaite?

A. To the best of my recollection, I don't recall a photo album.

Q. Do you ever recall discussing the fact that photographs had been confiscated from Mr. Brathwaite's cell, having that discussion with Captain Belanger?

A. No, I don't recall that.

MR. CAPONE: No further questions,

Your Honor.

THE COURT: Do you have any questions, Mr. Roberts?

CROSS EXAMINATION

BY MR. ROBERTS:

Q. Just so the record is clear, you represent the Department of Corrections?

A. That's correct.

Q. And you are a Deputy Attorney General?

A. That's correct.

Q. Have you and I had any type of substantive conversation about this case other than the fact that it was going forward and we needed your witnesses?

A. None whatsoever.

Q. To the best of your knowledge and information and belief, have I had any conversation with any employees of the Department of Correction that the defendant has called as witnesses?

A. To the best of my knowledge, no, none whatsoever.

MR. ROBERTS: Thank you. I have nothing further.

THE COURT: All right, sir.

IN THE SUPREME COURT OF THE STATE OF DELAWARE

06cv472

KEVIN C. BRATHWAITE,
Defendant Below,
Appellant,

v.

STATE OF DELAWARE,
Plaintiff Below,
Appellee.

NO. 169, 2003

APPENDIX
to
OPENING BRIEF

Date: January 30, 2004

Kevin C. Brathwaite
DCC # 315294
Building C
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

FILED
AUG - 8 2006
U.S. DISTRICT COURT
DISTRICT OF DELAWARE
Scanned

# TABLE OF CONTENTS

1. State V. Brathwaite, Del. Super., ID No. 9510007098 Toliver, J. (March 17, 2003) (Order). A-1

2. Brathwaite V. State, Del. Supr., NO. 169, 2003, Holland, J. (Dec. 29, 2003) (order) A-21

3. State V. Chao, Del. Super., IN88-03-1021, et seq., Gebelein, J. (Feb. 17, 1995) (order). A-26

4. Police interview statement of Salan Chapman A-37

5. Affidavit of Kevin C. Brathwaite A.44

6. Motion For New Trial (DI #109)

Ex. H. 1 - Affidavit of Kevin C. Brathwaite A-47

Ex. H. 2 - Sexual picture of Salan Chapman A-49

Ex. H. 3 - Confession of Salan Chapman A-50

Ex. H. 4 - Affidavit of Sir Olden Hoe Chapman A-51

Ex. H. 7 - Affidavit of Michael Davis A-54

Ex. H. 8 - Affidavit of Jackie Joner A-55

Ex. H. 9 - Affidavit of Romayne Jackson A-56

Ex. H. 10 - Affidavit of Cassandra Moore A-57

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE, )
)
v. ) ID. No. 9510007098
)
KEVIN C. BRATHWAITE, )
)
Defendant. )

**OPINION AND ORDER**

**On the Defendant's Motion for a New Trial**

Submitted: December 18, 2002
Decided: March 17, 2003

Donald R. Roberts, Esquire, Deputy Attorney General, Department of Justice, 820 North French Street, Wilmington, DE 19801.

Jerome M. Capone, Esquire, Towne Center, Suite 200, 4 East 8th Street, Wilmington, DE 19801, Attorney for the Defendant.

Mr. Thomas A. Foley, Esquire, 1326 King Street, Wilmington, DE 19801.

Mr. Kevin C. Brathwaite, Delaware Correctional Center, Box 500, RD #1, Smyrna, DE 19977, Defendant

**TOLIVER, JUDGE**

Presently before the Court is the motion filed by the Defendant, Kevin C. Brathwaite, seeking to set aside his conviction and be granted a new trial pursuant to Superior Court Criminal Rule 33. That which follows is the Court's resolution of the issues so presented.

**FACTS AND PROCEDURAL POSTURE**

Mr. Brathwaite was convicted of six counts of first degree, two counts of Unlawful Sexual Intercourse second degree, seven counts of Unlawful Sexual Intercourse third degree, one count of aggravated act of intimidation, one count of Unlawful Sexual Penetration third degree, and two counts of assault third degree on December 4, 1998. He was sentenced, *inter alia*, to several consecutive life sentences. On January 4, 1999, Mr. Brathwaite appealed his conviction to the Delaware Supreme Court. That appeal was

denied on October 22, 1999.[1] On December 16, 1999, Mr. Brathwaite filed a motion for new trial with this Court pursuant to Superior Court Criminal Rule 33 based on claims of newly discovered evidence and ineffective assistance of trial counsel.[2]

Insofar as the newly discovered evidence is concerned, Mr. Brathwaite alleges that Ms. Salan Chapman, who testified at his trial that Mr. Brathwaite raped her, intentionally withheld exculpatory evidence in order to secure his conviction. Mr. Brathwaite identifies at least one photo, purportedly of Ms. Chapman, in a highly revealing and compromising position, and an anonymous and very strongly worded letter which accompanied the photo. He claims that the photo and letter were sent to him by Ms. Chapman after

---

[1] *See* State v. Brathwaite, 741 A.2d 1025 (Del. 1999).

[2] Mr. Brathwaite was represented by two attorneys - Mr. David J. Facciolo represented Mr. Brathwaite until December 3, 1997, at which time he withdrew. Mr. Thomas A. Foley assumed responsibility for Mr. Brathwaite's defense on December 15, 1997, and continued as defense counsel throughout trial, as well as through Mr. Brathwaite's subsequent appeal to the Delaware Supreme Court. Mr. Brathwaite's claim of ineffective assistance of counsel is lodged against Mr. Foley.

his conviction but prior to his direct appeal. He further claims that these pieces of evidence prove that he and Ms. Chapman had a pre-existing, consensual, intimate relationship, a conclusion that would lie in direct contradiction to Ms. Chapman's trial testimony.

Mr. Brathwaite's claim of ineffective assistance of counsel is twofold. First, he argues that Mr. Foley was ineffective for failing to adequately investigate the list of witnesses provided him by the Defendant as well as for his decision not to call any of those witnesses at trial. Mr. Brathwaite asserts that these witnesses are willing to testify to his innocence and to a vindictive scheme concocted by Ms. Chapman to secure his conviction after the termination of their relationship. He also believes presentation of these witnesses would certainly have persuaded the jury as to his innocence, and that Mr. Foley's performance therefore fell well below the acceptable level of professionalism and gravely prejudiced his defense.

Second, Mr. Brathwaite argues that Mr. Foley was ineffective because he told the Defendant that the photos of Ms. Chapman and accompanying letter could not be presented on direct appeal to the Delaware Supreme Court, since they were not part of the original trial record. Mr. Brathwaite believes that had the Delaware Supreme Court had the opportunity to view these items, it would have undoubtedly remanded the case to the Superior Court for a new trial. He argues that a new jury, privy to these new items of evidence, would surely have declined to convict him on the charges regarding Ms. Chapman, and that his defense was therefore severely compromised by Mr. Foley's unwillingness to submit the photo and letter to the Supreme Court on direct appeal.

On January 18, 2000, Mr. Foley responded to and denied each of Mr. Brathwaite's allegations. Simply put, at least from Mr. Foley's perspective, there was no newly discovered evidence or ineffective assistance of counsel. He indicates that he met with the witnesses identified by Mr. Brathwaite

as helpful to his case, but chose not to use them for various reasons. Most importantly, he determined that none of the perspective witnesses would be supportive of the allegations made by Mr. Brathwaite.

More specifically, Mr. Foley asserted that one prospective witness, a resident of the same institution where Mr. Brathwaite had been incarcerated, confessed that Mr. Brathwaite had asked him to testify falsely in return for a favor that Mr. Brathwaite had previously performed for him. A second witness not only seemed less than credible, but would have testified, among other things, about Mr. Brathwaite's illicit drug selling activity which Mr. Foley felt would not help Mr. Brathwaite's image before the jury. The third witness was deemed to be credible by Mr. Foley notwithstanding having been convicted for crimes of dishonesty, but would only have restated what other witnesses were going to say. The fourth witness, Ms. Sonya Byers, simply refused to testify. Mr. Foley had no

recollection of the other individuals identified by Mr. Brathwaite in his motion having been named as prospective witnesses.

Mr. Foley further asserts that he maintained open and cordial communications with Mr. Brathwaite at all times during the proceedings, and strongly advised him to accept the State's plea offer. Mr. Brathwaite decided to exercise his right to a trial, and Mr. Foley avers that he defended him to the best of his ability.

With regard to the "newly discovered evidence" Mr. Foley stated that he never saw the photo in question, but was suspicious of its sudden appearance post-trial, and declined to investigate the matter during the direct appeal process. He believed that the photo would have been be more appropriately presented to the trial court in a postconviction proceeding.

Given the nature of the allegations made by Mr. Brathwaite and respective positions taken in response,

Jerome M. Capone, Esquire, was appointed by the Court to represent Mr. Brathwaite. An evidentiary hearing was deemed necessary and began as scheduled on November 2, 2001. However, because of time constraints, the hearing could not be completed on that date. On May 21, 2002, it was resumed and completed.[3] Testifying on behalf of Mr. Brathwaite were Ms. Sonya Byers, Stuart Drowos, Esquire, Captain Joseph H. Belanger[4] and Mr. Brathwaite himself. Appearing on behalf of the State were Ms. Salan Chapman, Ms. Carmen Chapman and Corporal Michael Rash[5].

Ms. Chapman[6] testified consistently with her testimony at trial. In addition to copies of the photo and letter, Mr. Capone introduced the affidavit of Ms. Chapman's cousin, Sir Olden Hue Chapman, which it was argued contradicted the

---

[3] There was a significant delay in resuming the evidentiary hearing because of the conflicts between the schedules of the attorneys and the Court. In addition, Ms. Chapman was expecting a child at the time of the first part of the hearing and its birth delayed the resumption along with the scheduling conflicts.

[4] Captain Belanger is a Department of Corrections Officer.

[5] Corporal Rash is a Department of Corrections Officer.

[6] References hereafter to "Ms. Chapman" are to Ms. Salan Chapman.

testimony of Ms. Chapman.

On December 18, 2002, the State filed its response.[7] Its argument, simply put, was that Mr. Brathwaite fails to meet the threshold requirements that would entitle him to the relief sought pursuant to Rule 33 and that his claims of ineffective assistance of counsel are unsupported by the record.

Mr. Capone filed his response on behalf of Mr. Brathwaite on November 17, 2002. In it Mr. Capone indicates that although Ms. Byers' fear of losing her job prevented her from testifying at Mr. Brathwaite's trial, she did offer evidence that conflicted, at least in part, with the testimony provided by Ms. Chapman at trial. Mr. Capone argues that testimony, along with the photo and letter received by Mr. Brathwaite post-trial, falls under the definition of "newly discovered evidence" referenced in Rule

---

[7] The Court notes that the State filed an initial response to Mr. Brathwaite's motion on February 2, 2000, advancing essentially the same arguments asserted in its December 18, 2002 motion. The Court will consider them as one.

33, and the obligations demanded of a motion so presented have been satisfied as a result.

**DISCUSSION**

In order to succeed in a motion for new trial pursuant to Superior Court Criminal Rule 33, the movant must meet the requirements articulated by the Superior Court in State v. Hamilton.[8] In Hamilton, the Court set forth the rule by which these motions must be measured:

> In order to warrant the granting of a new trial on the ground of newly discovered evidence, it must appear (1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial and could not have been discovered before by the exercise of due diligence; (3) that it is not merely cumulative or impeaching.[9]

Check with Greg

[8] 406 A.2d 879 (Del. Super. 1974).

[9] Hamilton at 880, *citing* State v. Lynch, 128 A. 565 (Del. Term. R. 1925).

The State points out that Mr. Brathwaite has failed to meet any of these requirements. First, he admits that he knew of the evidence in question prior to trial. Second, the State claims the evidence is merely cumulative and impeaching regarding his alleged relationship with Ms. Chapman and his belief that she was falsely accusing him. Third, the State argues that this "new evidence" is insufficient to change the outcome of the initial trial in any case. The Court agrees.

The record reveals that at least the photo proffered by Mr. Brathwaite was in his possession prior to his arrest, which necessarily means that it was available at the time of trial and discoverable by the exercise of due diligence. Mr. Brathwaite never mentioned these pieces of evidence he feels to be so crucial to his innocence before or during trial. In fact, these items were never brought to the Court's attention prior to Mr. Brathwaite's instant motion. Moreover, because they were produced following his

incarceration, the Court must view them with great caution.[10]

Mr. Brathwaite's motion is similarly compromised by the fact that his newly discovered evidence, advanced to support the notion that he and Ms. Chapman had a pre-existing intimate relationship, is merely cumulative. He testified at trial that they had shared a relationship that was sexual in nature as early as October of 1995.[11] Therefore, the photograph that shows a woman in a sexually revealing position, even if it is Ms. Chapman, is cumulative of testimony given before the jury at trial. Further, Mr. Brathwaite does not appear to appreciate that a prior sexual relationship, real or imagined, does not automatically indicate that Ms. Chapman consented to intercourse or other sexual activity on the occasion in question.[12]

As for the anonymous letter, Mr. Brathwaite claims that

---

[10] *See* Blankenship v. State, 447 A.2d 428 (Del. 1982).

[11] August 26, 1998 Tr. Transcript at p. 141-142.

[12] State v. Yowell, 1982 Del. Super. LEXIS 918 at 5.

it proves that Ms. Chapman concocted a scheme to have him convicted on false charges due to her hurt feelings over their recent breakup. However, Mr. Brathwaite also had the opportunity at trial to present his the theory that Ms. Chapman made up her story and lied under oath.[13] Presentation of the letter now in support of that same theory does not constitute newly discovered evidence, nor does it justify granting a new trial.

Because Mr. Brathwaite has failed to satisfy two of the factors of the Hamilton test, it is unnecessary for the Court to engage in discussion as to whether his "newly discovered evidence" would change the outcome of events if a new trial were granted. However, the Court does note that Mr. Brathwaite's conflicting and unreliable testimony at the two postconviction evidentiary hearings bolsters the Court's impression that the items in question would hardly sway a jury to acquit him of the crimes with which he was charged.

---

[13] August 27, 1998 Tr. Transcript at p. 81-82.

As such, they form an insufficient basis upon which a new trial may be granted.

As for Mr. Brathwaite's claim of ineffective assistance of counsel, Rule 33 provides that a motion for new trial must be made within seven days after verdict or finding of guilty if it is premised on grounds other than newly discovered evidence. Therefore, a claim of ineffective assistance of counsel should have technically been raised in a motion filed within that proscribed time period. However, it appears to the Court that it would have been nearly impossible for Mr. Brathwaite to have produced such a motion, *pro se*, within seven days of his verdict in satisfaction of Rule 33. Consequently, the Court will treat this claim as a motion for postconviction relief pursuant to Superior Court Criminal Rule 61, and will evaluate it accordingly.

Before the Court can consider the merits of a motion for post-conviction relief, the movant must first

overcome the substantial procedural bars contained in Superior Court Criminal Rule 61(i).[14] Under Rule 61(i), post-conviction claims for relief must be brought within three years of the movant's conviction becoming final.[15] Further, any ground for relief not asserted in a prior post-conviction motion is thereafter barred, unless consideration of the claim is necessary in the interest of justice.[16] Similarly, grounds for relief not asserted in the proceedings leading to judgment of conviction are thereafter barred, unless the movant demonstrates: (1) cause for the procedural default, and (2) prejudice from any violation of the movant's rights.[17] Finally, any ground for relief that was formerly adjudicated in the proceedings leading to judgment of conviction or in a prior post-conviction

---

14 Flamer v. State, 585 A.2d 736, 745 (Del. 1990); Younger v. State, 580 A.2d 552, 554 (Del. 1990); Saunders v. State, 1995 Del. LEXIS 17 at *5.

15 Super. Ct. Crim. R. 61(i)(1).

16 Super. Ct. Crim. R. 61(i)(2).

17 Super. Ct. Crim. R. 61(i)(3).

proceeding is thereafter barred from consideration.[18]

Mr. Brathwaite's conviction became final on October 22, 1999. The instant motion was filed on December 16, 1999, well within the three year time limit, and in satisfaction of Rule 61(i)(1). He has filed no prior postconviction motions, and is thus not barred by 61(i)(2). Mr. Brathwaite could not raise the issue of ineffective assistance of counsel in his direct appeal because his complaint addresses the way in which counsel handled both the trial and the appeal. He is therefore not barred by 61(i)(3). Finally, none of the claims raised by Mr. Brathwaite were previously adjudicated, and are therefore eligible for review under 61(i)(4). The Court therefore reaches the merits of Mr. Brathwaite's claim of ineffective assistance of counsel.[19]

---

[18] Super. Ct. Crim. R. 61(i)(4).

[19] Even if Mr. Brathwaite's motion had been procedurally barred by any portion of Rule 61(i)(1)-(4), those bars may be lifted if the defendant establishes a colorable claim that there has been a "miscarriage of justice" under Rule 61(i)(5). Though this exception is very narrow, and only applicable in very limited circumstances, a claim of ineffective counsel in violation of the Sixth Amendment to the United States Constitution, by its very nature, qualifies as just such an exception. *See* Mason v. State, 725 A.2d 442 (Del. 1999); State v. McRae, 2002 Del. Super. LEXIS 495 at *15.

In order to prevail, Mr. Brathwaite must satisfy the two factors set forth in Strickland v. Washington[20]. First, he must demonstrate that counsel's representation fell below an objective standard of reasonableness. Second, he must show that counsel's actions were prejudicial to the defense, creating a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.[21] The Strickland standard is highly demanding and under the first prong of the test, there is a "strong presumption that the representation was professionally reasonable."[22]

Mr. Foley's response and the State's response show that Mr. Foley did in fact investigate the list of individuals provided him by Mr. Brathwaite, and that he made extensive notes at that time as to the fitness of each prospective

---

20 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).

21 Strickland at 694.

22 Stone v. State, 690 A.2d 924, 925 (Del. 1996); Flamer at 753.

witness.   That Mr. Foley in his professional judgment

determined whether each could or could not make a credible

contribution to Mr. Brathwaite's case does not constitute

ineffective assistance of counsel.   Despite Mr. Brathwaite's

belief that presentation of these witnesses would

undoubtedly have convinced the jury of his innocence, the

decisions that Mr. Foley made appear to not only satisfy an

objective standard of reasonableness, they appear to be

sound trial strategy as well.

Mr. Brathwaite is also mistaken in his belief that

evidence not made part of the record at the trial level may

be presented on direct appeal before the Supreme Court.

Supreme Court Rule 9(a) states, "Record - Contents.   An

appeal shall be heard on the original papers and exhibits

which shall constitute the record on appeal".   The photo and

letter Mr. Brathwaite wished to present (for the first time)

during the proceedings therefore would not have been

eligible for the Supreme Court's review on direct appeal, as

they were not made part of the record during his trial before this Court. Mr. Foley, again demonstrating competent lawyering, was quite right to decline to present the items in that context and to reserve them for a postconviction proceeding.[23]

In sum, Mr. Brathwaite has failed to demonstrate that counsel's assistance was unreasonable and has thus failed the first prong of the Strickland test. As a result, it is unnecessary for the Court to reach the second prong of that test.

---

[23] Mr. Brathwaite's related claim that the jury would certainly have found him not guilty if they had had an opportunity to view the items in question is speculative at best. Since the Supreme Court would not have viewed those items on direct appeal, pursuant to Rule 9(a), that Court would have had insufficient evidence on which to predicate a remand, and there would have been no remanded trial at which a jury could view the photo or letter.

## CONCLUSION

For the foregoing reasons, Mr. Brathwaite's motion for a new trial and/or postconviction relief must be, and hereby is, denied.

IT IS SO ORDERED.

TOLIVER, JUDGE

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KEVIN BRATHWAITE, | § | |
| | § | |
| Defendant Below-Appellant, | § | No. 169, 2003 |
| | § | |
| | § | |
| v. | § | Court Below—Superior Court |
| | § | of the State of Delaware, |
| STATE OF DELAWARE, | § | in and for New Castle County |
| | § | Cr. ID 9510007098 |
| Plaintiff Below-Appellee. | § | |
| | § | |

Submitted: December 3, 2003
Decided: December 29, 2003

**ORDER**

This 29th day of December 2003, it appears to the Court that:

(1) The appellant, Kevin Brathwaite, has filed several motions that are currently pending for the Court's consideration. Brathwaite's first two motions request production of documents from his former counsel and from the State.[1] Brathwaite's third motion seeks to prevent the Department of Correction (DOC) from transferring him to another correctional facility out-of-state. The State has filed responses in opposition to both of Brathwaite's motions. The Court also has received a response to Brathwaite's motion for production from Brathwaite's former counsel.

[1] The Court had held these motions in abeyance pending the receipt of certain transcripts from the Superior Court.

(2) The record reflects that Brathwaite was sentenced to life imprisonment in 1998 following his convictions on multiple charges of sexual assault and related offenses involving several victims. This Court affirmed his convictions on direct appeal.[2] Thereafter, Brathwaite filed a motion for new trial asserting newly-discovered evidence, which his trial attorney allegedly had failed to discover before trial. Because his motion raised allegations of ineffective assistance of counsel, the Superior Court appointed new counsel to represent Brathwaite and treated his motion for new trial as a motion for postconviction relief. The Superior Court denied Brathwaite's motion. After counsel filed this appeal on Brathwaite's behalf, Brathwaite sought to discharge his attorney and represent himself on appeal. This Court granted Brathwaite's motion to proceed pro se.

(3) Brathwaite has filed motions seeking to compel the State and his former counsel to provide him with certain documents and photographs. Brathwaite alleges that the documents and photographs are necessary for him to present his arguments on appeal. The Court has received responses to the motions from Brathwaite's former counsel and from counsel for the State.

---

[2] *Brathwaite v. State*, Del. Supr., No. 549, 1998, Hartnett, J. (Oct. 22, 1999).

(4)   Brathwaite's former counsel, who represented Brathwaite during the postconviction proceedings, filed a letter with the Court indicating that counsel sent Brathwaite his file as well as the file of Brathwaite's trial counsel. Given counsel's representations that he has provided Brathwaite with the requested files, the Court finds no basis to grant Brathwaite's motion. Brathwaite's motion to compel production of documents from his former counsel, therefore, is denied.

(5)   With respect to Brathwaite's other motion to compel, the State has responded in opposition to the motion. First, the State represents that the documents and photographs sought by Brathwaite have been lost. The documents and photographs, which purportedly were nude photographs of one of the victims (a fact disputed by the State), apparently were in Brathwaite's cell and were confiscated by correctional officials and subsequently lost or destroyed. Second, the State asserts that, even if the documents could be provided to Brathwaite, the documents were not a part of the record below and therefore could not be considered by this Court on appeal. Brathwaite does not dispute the documents and photographs in question were not part of the record below. Accordingly, there is no basis to grant Brathwaite's motion because the materials sought no longer exist. In any event, this Court would not consider the alleged evidence on appeal

because it was not part of the record below.[3]   The Court's denial of Brathwaite's motion to compel is without prejudice, however, to Brathwaite's right to raise any appropriate argument regarding the missing photographs and documents in his opening brief on appeal.

(6)   Finally, Brathwaite has filed an emergency motion requesting this Court to direct the Department of Correction not to transfer Brathwaite to an out-of-state correctional facility. Brathwaite contends that, as a pro se litigant, he will be prejudiced because he will not have access to Delaware legal reference materials. The State disputes Brathwaite's factual assertion. According to the State, the Department of Correction provides all Delaware inmates transferred to out-of-state facilities with reasonable access to Delaware legal materials in accordance with this Court's decision in *Johnson v. State*.[4] Moreover, the State argues that this Court, as an appellate body, lacks jurisdiction to review the factual basis for Brathwaite's transfer or to intervene in the prison administrator's decision to transfer an inmate.[5] The State is correct that this Court lacks jurisdiction, in the first instance, to

---

[3] Del. Supr. Ct. R. 8.

[4] 442 A.2d 1362 (Del. 1982).

[5] *See Brooks v. Watson*, 1995 WL 354940, n.* (Del. June 9, 1995) (recognizing that "the prison administrator's discretion to transfer a prisoner is unfettered, and the prisoner has not liberty interest entitled to due process protection.").

issue an extraordinary writ to correctional officials.[6] Accordingly, we have no jurisdiction to prevent Brathwaite's transfer to an out-of-state facility. Thus, Brathwaite's motion must be denied. Our denial of Brathwaite's motion is without prejudice to Brathwaite's right to assert his right of access to Delaware legal materials if the denial of access becomes an issue following his transfer.

NOW, THEREFORE, IT IS ORDERED that Brathwaite's motions to compel and his emergency motion to prevent his out-of-state transfer are DENIED.

BY THE COURT:

/s/ Randy Holland
Justice

---

[6] *In re Hitchens*, 600 A.2d 37 (Del. 1991) (holding that Supreme Court's jurisdiction to issue an extraordinary writ is constitutionally limited to instances when the respondent is a court or judge thereof).

IMPAC
R- 2/17/95

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

# IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| V. | ) | Cr. A. Nos. IN88-03-1021-1025 & 1027, 1028 |
| | ) | IN88-04-0832-0836 |
| VICKY CHAO, | ) | |
| | ) | |
| Defendant. | ) | |

Date Submitted: September 7, 1994
Date Decided: February 17, 1995

## MEMORANDUM OPINION

Upon defendant's motion for a new trial. **GRANTED.**

Steven P. Wood, Esquire, Department of Justice, Wilmington, Delaware for the State.

Joseph A. Hurley, Esquire, Wilmington, Delaware for the defendant.

GEBELEIN, Judge

Defendant's motion for a new trial on the ground that the State's primary witness committed perjury at her trial is GRANTED.

On August 14, 1989, defendant Vicky Chao was found guilty of all counts of an indictment, including multiple counts of murder in the first degree and related offenses. After a penalty hearing at which the jury was unable to reach a unanimous verdict, she was sentenced to life imprisonment on May 24, 1990. Defendant appealed the convictions and they were affirmed by the Supreme Court on January 29, 1992. Her co-defendant also named in the same indictment, Tze-Poong Liu, was subsequently tried for these murders. At the co-defendant's trial, a material State witness, William Chen, testified and admitted that he had previously lied under oath at defendant's trial.

Defendant now moves for postconviction relief pursuant to Superior Court Criminal Rule 61 on the ground of ineffective assistance of trial counsel. Defendant also moves for a new trial on the basis that one of the State's primary witnesses, Mr. Chen, perjured himself at defendant's trial. This Court held two evidentiary hearings on defendant's motions and has received extensive post-hearing briefing on these motions.

## I. Ineffective Assistance of Counsel Pre-trial

In support of her motion for postconviction relief, defendant alleges three bases of ineffective assistance of counsel during the pre-trial stage: (1) that trial counsel failed to request an interpreter for her at her suppression hearing; (2) that defendant was denied an opportunity to testify at her suppression hearing; and (3) that trial counsel's pre-trial preparation was constitutionally inadequate. To succeed on a claim of ineffective assistance of counsel, defendant needs to show that her "counsel's representation fell below an objective standard of reasonableness," and "that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Under Delaware law, the test is whether under the totality of the circumstances, "counsel was so incompetent that the accused was not afforded genuine and effective legal representation." *Renai v. State*, Del.Supr., 450 A.2d 382 (1982). The *Renai* Court noted that a defendant's burden in establishing a claim for ineffective assistance of counsel is difficult to meet:

> "A retrospective examination of a lawyer's representation to determine whether it was free from any error would exact a higher measure of competency than the prevailing standard. Perfection is hardly attainable and certainly is not the general rule, especially in professional work where intuitive judgments and spontaneous decisions are often required in varying circumstances . . . . [W]hat is required is normal and not exceptional representation . . . .

450 A.2d at 384, quoting *Moore v. United States*, 432 F.2d 730, 736 (3d Cir. 1970).

The Court need not reach the issues raised by defendant with respect to the adequacies of representation by Court-appointed counsel as its decision on defendant's motion for a new trial renders those issues moot.

## II. PERJURED TESTIMONY

### A. *The Applicable Standard*

A review of case law reveals that U.S. courts are applying a choice of two standards in deciding a motion for a new trial based on "newly discovered" evidence. Under the so-called *"Berry"* standard, the requirements are: (1) the evidence must have been discovered after the trial; (2) the failure to learn of the evidence must not have been caused by defendant's lack of diligence; (3) the new evidence must not be merely cumulative or impeaching; (4) it must be material to the principal issues involved; and (5) it must be of such a nature that in a new trial it would probably produce an acquittal. *Berry v. State*, 10 Ga. 511

(1851). In contrast, other courts distinguish witness recantations from "newly discovered" evidence and apply the so-called "*Larrison*" test which requires: (a) the Court is reasonably well satisfied that the testimony given by a material witness is false; (b) that without it, the jury *might* have reached a different conclusion; (c) that the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial. (emphasis in original). *Larrison v. United States*, 24 F.2d 82, 87-88 (7th Cir. 1928). The application of these tests by State Courts have not been uniform.

It appears to this Court that, in the case of admittedly perjured testimony, the *Larrison* test is the standard appropriate in Delaware. The State argues that "[i]t is well-settled that a motion for a new trial based on the perjury of a State's witness is to be treated as a motion for a new trial based on newly discovered evidence. Such a motion shall not be granted if the new evidence is 'merely cumulative or impeaching.'" In support of its argument, it directs the Court's attention to *Lloyd v. State*, Del.Supr. 534 A.2d 1262 (1987), and *Gov't of Virgin Islands v. Lima*, 774 F.2d 1245 (3d Cir. 1985), both of which used the *Berry* approach in denying the defendants' motion for new trial.

*Lloyd* may be distinguished from the instant case because that case does not involve a motion for a new trial based on a material State witness who committed perjury at trial. Rather, *Lloyd* dealt with whether the availability of a new witness to testify who had earlier refused to do so by invoking her Fifth Amendment privilege against self-incrimination. The Court held that such proffered testimony was "newly discovered" evidence. *Lima* may also be distinguished from the present case. That case does involve a motion for a new trial challenging a State's witness' credibility. But, that court reasoned that *Larrison* did not apply

to its facts because the court below had found that the witness had not, in fact, committed perjury; not the situation here where the witness admits to the untruth of his prior testimony. *See, Lloyd, supra* at 1251, n.4. In other words, because the trial court answered the threshold question of whether the new evidence showed the original witness' testimony was false in the negative, *Larrison* did not apply. *Id.* at 1251.

In the present case, however, the new evidence clearly demonstrates that one of the State's primary witnesses committed perjury at defendant's trial. Moreover, the State concedes in its reply brief that the witness perjured himself. Furthermore, the Delaware Supreme Court observed that it had chosen to adopt the *Larrison* standard in a case involving a new trial motion based on a witness' post-trial recantation. Blankenship v. State, Del. Supr., 447 A.2d 428 (1982). It appears, therefore, that the Supreme Court has decided to apply the *Larrison* test where defendant bases his new trial motion on perjured testimony. Therefore, this Court must apply the *Larrison* standard in this case.

*B. False Testimony*

After reviewing the record, the Court is satisfied that the State's primary witness, Mr. Chen, committed perjury at defendant's trial. Defendant claims that Mr. Chen falsely testified about the frequency of visits and the length of his stay at apartment 2C in New York in the fall of 1987. She points out that while he testified at her trial that he only went to New York on occasion, he testified at Liu's trial that he lived in apartment 2C for as much as two months at a time. Defendant also argues that Mr. Chen himself admitted to lying under oath. The State contends that a fair reading of Mr. Chen's testimony regarding apartment 2C does not establish that perjury occurred as to length of stay. Moreover, the State argues that Mr.

Chen admitted to committing perjury only as to the nature and extent of his relationship with defendant and nothing else.

It is a disingenuous argument to claim that defendant has not satisfied her burden because her specific allegation does not technically establish that Mr. Chen committed perjury on one issue when it is clear perjury was committed on another issue. To the contrary, the record clearly shows that a material State witness perjured himself on a highly relevant issue in the case, motive.

Mr. Chen himself admitted that he lied under oath about the nature of his relationship with the defendant when he testified at trial that he did not have sexual relations with defendant in 1985, 1986 or 1987. The State does not dispute that, as to this area of testimony, he committed perjury at her trial. Given Mr. Chen's admission, the Court cannot treat lightly defendant's allegation of perjury as to his testimony regarding the length of his stay in apartment 2C. That testimony is pertinent to the same issue of whether their love affair had continued and existed after Mr. Chen became married.

In this case the State clearly made motive a substantive issue. In the State's summation, the prosecutor noted,

> In this trial it is easy to understand who and it's easy to understand how if you first ask yourself this question. Why?

The State then went onto note that the victim, William Chen, had "at one time loved the defendant." Indeed, the theme of the State's case beginning with the opening statement was that the defendant was a woman scorned and that the case was one of her "fatal attraction". The truth of the matter was (as William Chen admitted at the co-defendant's trial) he continued his

relationship with Ms. Chao unabated spending significant periods of time with her in New York City.

The Court finds that the record clearly supports that the State's primary witness gave perjured testimony on a substantive issue in the case.

*C. A Different Result*

The Court finds that the jury "might" have reached a different result if Mr. Chen's false testimony were corrected. At trial, the State advanced the theory of the existence of a "love triangle" involving defendant, Mr. Chen and Mr. Liu. The State hypothesized that defendant and Mr. Liu were lovers and that Mr. Liu was jealous of Mr. Chen and considered the latter a rival for defendant's affections.

The lynchpin of the State's case, however, was the theory that after Mr. Chen's marriage, defendant became a woman scorned, obsessed with the idea of having Mr. Chen and that if she could not have him then no woman would. This "fatal attraction" theory was the framework in which the facts and evidence were presented to the jury in its opening and closing arguments. The State presented the following picture to the jury: after arriving in the United States, Mr. Chen became involved with defendant in New York, an older woman and fifteen years senior to Mr. Chen's deceased wife, one victim in this case. The affair lasted about six years during which time defendant taught him English and helped him start his business by lending him a substantial amount of money. But, in 1985, Mr. Chen married and began a life with his wife, daughter and his mother in a clean, comfortable suburban home in Wilmington. This setting was compared to the dirty New York apartment that "stank". Despite defendant's pleading to stay with her in New York, Mr. Chen refused to leave his family and instead stayed

in his suburban New Castle County home. The prosecution continued that defendant confronted William Chen in his Delaware home in front of his family where she again demanded that he leave his family for her. Mr. Chen refused whereupon defendant then threatened to cause "big trouble." Nine days later, Mr. Chen's home burned to the ground and his family perished in the fire.

The State's theory of the case advanced a powerful motive of murder and revenge on the part of defendant against Mr. Chen and his family. The State based its argument in the case on the jury finding who had the best motive to commit the crimes.[1] The deputy attorneys general repeatedly emphasized to the jury that defendant had that motive to commit murder. The State pointed out that Mr. Liu became defendant's co-conspirator because he, too, had a motive: to rid himself of a rival. Under the State's framework of the case, only Mr. Chen had no motive for setting fire to his house or murdering his family.

This question of motive being the crux of the State's case against defendant, the prosecutors argued that the jury resolve all inconsistencies in witness' testimonies and credibility problems in Mr. Chen's favor by arguing that he was believable because he alone had no motive to do away with his family. The State characterized him as the innocent, though not too wise or strong-willed, family man who became embroiled in a turbulent relationship with an older

---

[1] A few specific examples are: ". . . interwoven with this question of who was criminally responsible is the question why. And although the State does not have the burden to prove motive, it will indeed establish a motive which, in turn, will establish who was criminally responsible." (State's Opening, 19); "In this trial it is easy to understand who and it's easy to understand how if you first ask yourself this question. Why?" (State's Closing, 109); ". . . Chao had the motive. Both she and Tze Poong Liu had the opportunity and we know that Liu had the means, motive, opportunity and means equals guilt." (State's Closing, 210).

woman and had ended that relationship leaving the defendant alone in New York with her "fatal attraction".

Given that the State has made much of motive in this case, if Mr. Chen's perjured testimony had been corrected, then he might also have a motive for committing the crimes. The jury would have heard his true testimony that the love affair which he had maintained ended after his marriage had not truly ended. Rather, he would have testified that they continued to have sexual relations in 1985, 1986 and 1987. In addition, he would have stated that instead of occasional trips to New York, he stayed at apartment 2C for as long as two months as late as the Fall of 1987.

The significance of his true testimony is that the jury would have heard evidence of the continued existence of an affair between defendant and Mr. Chen after his marriage. His other testimony would have been subject to additional attack because the jury could have discerned a possible motive on the part of Mr. Chen to be rid of his family. The jury certainly would not have seen him as the innocent family man desperately trying to end a stormy adulterous relationship as the State proffered. Ultimately, the jury could not have found the State's theory of defendant's motive for murder and revenge as powerful. The jury would indeed have seen the defendant as a woman capable of pulling Mr. Chen to New York in spite of his young wife and nice suburban house. Thus, with Mr. Chen's true testimony, the jury could well have found a different result in a case where the State acknowledged "it is easy to know who ... if you (know) ... why?".

*D. Defendant's Knowledge of the Falsity of the Testimony*

The State argues that defendant could not have been surprised by Mr. Chen's testimony at trial. The State claims that she would have known immediately had he lied on the stand about the length of his stay in apartment 2C because she was his "de facto" landlord and also when Mr. Chen lied about the nature of their relationship after his marriage. The State contends that since he testified almost two weeks before defendant, she had ample time to refute his testimony.

Even if defendant knew immediately that Mr. Chen had perjured himself at trial, she would still have been surprised. Defendant might well have anticipated what Mr. Chen would probably answer to questions about the two issues had they been answered truthfully. When Mr. Chen denied having any sexual relations with her after his marriage and downplayed his involvement with her, she could not have been but surprised by his answers.

It is difficult to see how defendant could meet this surprise at trial because of the particular theory of the case chosen by each party. The State in its opening introduced the idea of a "fatal attraction" love-triangle theory which motivated defendant to commit the crimes. Defendant, on the other hand, had committed to minimizing that theory of the State.

While it is true that defendant knew or should have known that William Chen was committing perjury at the trial, her ability to attack that testimony was to place her credibility as the defendant charged with murder against that of a victim whose family had been brutally murdered and for whose credibility the State vouched. Indeed, the credibility of Mr. Chen on other important issues was bolstered by the State's argument that he had no motive to testify falsely.

The Court concludes that while defendant knew of the falsity of William Chen's testimony, she was not in a position to effectively counter that false testimony.

## IV. Conclusion

Because the Court finds that substantially all of the elements required under the *Larrison* test have been satisfied, defendant's motion for a new trial is **GRANTED.**

**IT IS SO ORDERED.**

The Honorable Richard S. Gebelein

A205 Um hum.

Q206 Full beard, mustache?

A206 Yeah.

Q207 And his head's clean, he's got no hair on his head?

A207 Yeah.

Q208 How about any ah scars, or marks, or tattoos, or anything like that on him?

A208 He got a tattoo on the left, says, "Mom," on the other side and a tattoo, it's some type of crypt, gang sign.

Q209 Is this on his chest?

A209 Um hum, yes.

Q210 Okay, when you left his house alright, I know this is just before, but when you left his house?

A210 Um hum.

Q211 What time was it?

A211 When I left, 1:35.

Q212 And then you went over your boyfriend's house?

A212 Yes.

Q213 What time did you call the police?

A213 Well when I had went to my boyfriend's and he had called my mom, and she had told me, she said, "Go over to the hospital together." We went to the hospital and then the police got over were waiting outside, and he said, "Somebody would be right over."

Q214 Okay, as far as you know I right now he is still at his house right?

A214 He, what he had told me...when I told that I had to...I was going over to meet my cousin over at the Thunderguards, and he had said ah, "But you don't got to go over there, you can come, you can stay here," and I was like, "Well I'll just be back," and he wanted me to come back at four o'clock.

Q215 Before tonight had you ever been in his apartment before?

A215 Went there with my sister.

Q216 And that was the only other time that you had been actually inside?

A216 Right.

Q217 Okay, so you didn't feel threatened by this guy?

A217 Right.

Q218 You didn't think there was anything?

A218 I thought it was...no, friends and that was it.

Q219 And there had never been any talk between you and him of having sex or anything like that?

A219 No.

Q220 And you've never had sex with him in the past?

A220 No.

Q221 How'd your boyfriend found out about it? Did you tell him or did you just what? Did he noticed you were upset or something like that or what?

A221 Yeah, when I went over he seen me upset. He was going...asking, "What's wrong?" So I told him what happened.

Q222 If you see a picture of this subject, you're pretty sure you can identify him?

A222 Yes.

Q223 At anytime while you were in the apartment did he have any weapons that you know of?

A223 I had just seen a butter knife on the floor, when I picked up my clothes.

Q224 Okay.

A224 And that was just...

Q225 While you were in the apartment while he was having intercourse with you, did you ever feel like you could just get up and leave?

A225 No.

Q226 You didn't feel that you could leave?

A226 No.

Q227 Did you ever have the opportunity to just jump up and go?

A227 No.

Q228 Not at all?.

A228 No.

Q229 Even when he left you alone for a little bit?

A229 No, 'cause he told me, "I better not move or he was going to hurt me."

Q230 Did he have his door lock? Do you remember? Did you have to unlock it to get out?

A230 Yeah, I had to unlock to get out.

Q231 Did he ever...

A231 He just said, "Don't ah," ah "You can't scream or nothing, ain't nobody gonna' hear you 'cause my nephew is having party across the hall, and ain't nobody gonna' be able to hear you anyway."

Q232 Did he hurt you? Did he hit you or slap you or...

A232 Just choked my neck real tight.

Q234 Okay and that was initially when the whole thing started is when he came up behind you?

A234 Yeah.

Q235 Okay, while you were on the bed after you had gagged you and put blind-fold on you and he never grabbed you by the neck or did anything?

A235 Unh unh.

Q236 Smacked you or anything like that?

A236 No.

Q237 Okay, with all the pain that you were going through okay? Did you scream or anything like that?

A237 I--I tried, but the sock was in my mouth.

Q238 Prior to the sock in your mouth?

A238 No.

Q239 Once you knew what was going on I mean you had an idea what was going on right?

A239 When he choked me?

Q240 Yeah, I mean you knew something was going on right there, right?

A240 When he choked me, yeah.

Q241 I mean...

A241 No, I didn't try...I was--I was scared and I don't know what just scared, I just did.

Q242 The apartment that he lives in you said it's directly by the Cumberland Farms?

A242 Yes.

Q243 And you're not sure of what the address is there?

A243 I figured, the other officer said it could be 1403, but...

Q244 Okay.

A244 Where the, I thought it was 403.

Q245 And how about the apartment, do you know what the apartment was?

A245 "B."

Q246 "B," alright. Have you ever been in any of the other apartments in that building?

A246 No.

Q247 Okay, is there anything else that you can think of or you might want to add?

A247 No.

Q248 Franny is there anything else that you can think of? What I'd like to do now is show you a series of Wilmington Police pictures and see if you recognize the individual that was involved in this incident, okay.

A248 That's him.

RD That's him. Okay, let the record reflect that Salan Chapman picked out ah identification folder picture number three. There's nothing else you want to add or anything like that? The time is 0712 hours and this will conclude the interview.

DA pictures

October 1, 2003

Mrs. Cathy L. Howard
Clerk of the Court
Supreme Court of Delaware
55 THE GREEN
Dover, DE 19901

RE: Brathwaite v. State, NO. 169, 2003
- Meyer letter dated September 26, 2003
- Production of documents

Dear Mrs. Howard,

DAG Loren C. Meyers letter dated September 26, 2003 indicates that there is some confusion concerning the subject of Appellant's July 26, 2003 Motion for production (Doc. No. 24). Specifically, DAG Meyer's letter states that "the motion is based on actions by corrections officers." However, the motion is based upon actions of DAG Stuart B. Drowos not those of "corrections officers."

The motion states that the exculpatory pictures and letters from Salan Chapman were confiscated by corrections officers and turned over to DAG Drowos prior to the evidentiary hearing, that DAG Drowos admitted to taking possession of this exculpatory evidence, that this exculpatory evidence was still in the possession of DAG Drowos (although misplaced), and that this exculpatory evidence is material and essential to proving that Ms. Chapman and Carmen Rodreguiz committed perjury at trial resulting in the conviction of an innocent man (see attached affidavit).

I hope that this will resolve any confusion, and assist DAG Meyers in locating and producing this exculpatory evidence without further delay.

Thank you.

Sincerely, [signature]

Kevin Brathwaite
PRO SE
#315294 Bldg. C
Delaware Correctional Center
1181 Padlock Road
Smyrna, DE 19977

enc.

xc: Mr. Loren C. Meyers, DAG
Delaware Innocent Project

IN THE SUPREME COURT OF THE STATE OF DELAWARE

KEVIN C. BRATHWAITE,
Appellant,

V.

STATE OF DELAWARE,
Appellee.

NO. 169, 2003

AFFIDAVIT OF KEVIN C. BRATHWAITE

I, Kevin C. Brathwaite, do hereby swear, under the penalty of perjury, based upon my personal knowledge, that the following facts are true and accurate:

1. Prior to the Superior Court evidentiary hearing, Smyrna prison correctional officers confiscated exculpatory pictures and letters from me.

2. At the evidentiary hearing, DAG Stuart B. Drowos confessed that he had received this exculpatory evidence from the corrections officers.

3. That this exculpatory evidence is essential for me to prove that Salan Chapman and Carmen Rodreguiz committed material perjury at my trial, as follows:

a.1. At trial, Salan Chapman testified that she had no consentual sexual relations with me.
a.2. Pictures #1, #2, #3, #4, #5, #6, and #7 prove that Salan Chapman had consentual sexual relations with me on numerous occassions.

b.1. At trial, Salan Chapman testified that she had never been in my bedroom.

b.2. Pictures #3 and #4 prove that Salan Chapman was in my bedroom, naked, on at least two seperate occassions.

c.1. At trial, Salan Chapman testified that she never had consentual sexual relations with me in my bedroom.

c.2. Pictures #1 and #5 prove that Salan Chapman had consentual sexual relations with me in my bedroom.

d.1. At trial, Salan Chapman testified that she had never had consentual sexual relations with me in my living room.

d.2. Pictures #5, #6, #7 prove that Salan Chapman had consentual sexual relations with me in my living room on at least three separate occassions.

e.1. At trial, Salan Chapman testified that she would give truthful testimony.

e.2. Letters #1, #2, and #3 prove that Salan Chapman did not testify truthfully and withheld exculpatory evidence at my trial.

f.1. Letter #2 proves that the motive for Salan Chapman testifying falsely was racial hatred and jealousy.

g.1. Letter #1 proves that Salan Chapman conspired with Carmen Rodreguiz to testify falsely at my trial.

Sworn to and signed this 2d day of October, 2003.

Kevin Brathwaite #315294

Notary

Page 3 o 3. A-46

# Affidavit

I Kevin Brathwaite States the following,

After I was Sentenced on 12-4-98, I received a letter and a photograph from Salan Chapman. The letter was written by Salan Chapman and the Contents of the letter Validates my testimony I gave at my trial.

Also, the photograph clearly shows Salan Chapman in my apartment, in a Sexually Compromising position Completely Nude. At my trial Ms. Chapman testified that she and I had never had any Sexual contact and that she had never been in my apartment in that way prior to these allegations. This photograph clearly shows that she is in my apartment, because the Surroundings in this photograph are clearly the same Surroundings as the photographs that the State introduced as evidence. This photograph is only one of many photographs that I attempted to obtain prior to ~~my~~ the Commencement of my trial.

EXH. I

A-47

I Am enclosing A copy of the letter And photograph with this Affidavit, And I will glady Supply the court with the original photograph if And when I Am brought into court.

I Know this handwriting to be that of Salan Chapman, And An expert Appointed by the court will prove it.

[signature]

[signature] [signature]

Commission Expires 02/15/2000

11-17-99



A-49

EXH. 2

Hi Asshole,

I told you that I was going to get your Black Ass, didn't I you stuttering motherfucker.

Do you remember those pictures you were trying to find? Well I'm the one who had them. I told you not to fuck with me, and your Stupid Ass just wouldn't listen.

I hope you and that white Black Bitch die & rot in Hell!!!

Take this picture and dream you Stupid Motherfucker!!!

Dear Judge Toliver,

My name is Sir Olden Hue Chapman, I am the first cousin of Salan "Melle" Chapman. I am writting this letter to let it be known to all that it concerns that Kevin Brathwaite is not quilty of the allegations brought against him by my cousin Melle. I know that she is my blood relative, but right is right and wrong is wrong. I cannot just ignore this situation and let this man be punished for a crime he did not commit.

I know for a fact that Kevin Brathwaite and my Cousin Salan Melle Chapman were intimately involved from the summer of 1995

and January of 1996. There were at least three separate occassions between the summer of 1995 and January of 1996, that I went to Kevin Brathwaite's apartment at 1401 Maryland Ave., and when I Knoched at the door, my cousin Melle had answered the door wearing only a night-gown. From her ppearance I could tell she had just gotten ut of bed.

There had also been times when I would all Kevin at his apartment in the middle of the ight, and my Cousin Melle would answer the phone. So when she says her and Kevin were never ntimately involved, she is blatantly and absolutely telling a lie. I never believed it would go this ar, so it would be an injustice for this man

A-52

EXH. 5

to go to jail, without the truth being known! So if there is any way I can be of some assistance to be sure that justice is rightfully delegated, please let me know. I can be contacted at this address;

Sir Olden Hue Chapman
13 meadow brooke Ave
Wilmington, DE. 19804

Phone # (302) 993-0331

Graciously,

Sir Olden Hue Chapman

[signature] 9/8/98
Notary Public
Comm's Expires March 12, 1999

Date

To Judge Charles Toliver
From: Michael Davis
Re: Brathwaite
Date: September 8,- 1998

Dear Sir,

I am writing you this letter to inform you that I have information which is very pertinent to the allegations brought against Kevin Brathwaite. After talking with Mr. Brathwaites attorney, Thomas Foley, I was told that I would be called to testify at trial. It has since been brought to my attention that the trial is over and the results were not favorable for Mr. Bathwaite. The information that I hold in reference to these allegations would have given any reasonable person much doubt that this incedent occurred. I am very concerned about what has taken place in this matter because as I see it Kevin Brathwaite was not treated fairly nor was he allowed to defend himself properly. I am truly praying that something will be done and that I will be heard.

Thank you for reading this letter and God bless you.

Repectfully,

Michael L. Davis

Michael Davis

EXH. 7

A-54

To: The Honorable Judge Toliver

From: Mr. Jackie Jones

RE: Mr. Kevin Brathwaite

Dear Sir,

This letter is in regards to the trial that commenced on Aug. 18th 1998. I recieved a subpoena to give testimony in regards to the knowledge that I have about the allegations against Kevin Brathwaite. I know for a fact that my testimony would have totally disputed Shane Osburns allegations.

I appeared in court everyday of the trial as ordered, But I was repeatedly told by Kevin's attorney that my testimony was not needed! I don't understand why Kevins to be heard, and I truly feel that intervention should be applied. Because as it stands now this clearly shows a lack of interest in Kevin innocense by his attorney.

Your Honor, Kevin is a lay person and totally put his trust and faith in his attorney. I am requesting that this matter be reviewed and the wrong be corrected. Kevin's attorney told him that I refused to testify and that was a blatant lie.

Thank you for you time and attention in this very urgent matter.

Respectfully Mr. Jackie L. Jones Jr

A-55

To: Judge Toliver
From: Romayne Jackson
Re: Brathwaite

Dear Judge Toliver,

I talked to the attorney that represented Kevin Brathwaite at his trial. I told him that I was aqainted and did know Shana Osburn and that she is a master of manipulation and she is not to be trusted. I also told Mr. Brathwaites attorney that I have first hand information that I have also come to know that Shana Osburn concocted this whole story about Kevin to get back at him. If I were to be heard, I would have cleared Kevin Brathwaite of these charges. So If there is anything you can do to correct this situation I am still willing to be heard.

Thank you in advance for your time and cooperation in this matter. I await to hear from you.

Respectfully,

Romayne Jackson

Romayne Jackson

I.D.

EXH. 9

Dear Judge Toliver, 9-2-98

My name is Cassandra Moore. The reason I am writing you this letter is because I am really Concerned about the wrong doings that are Continuously being permitted to take place in our justice system.

I talked to Thomas Foley on the phone regarding Salan "melle" Chapman and Kevin Brathwaite. I am sure that I told Mr. Foley that I called Kevin's house on two separate occassions and Salan answered the phone and was very agitated that another female was Calling Kevin at home. She then proceeded to Curse at me and told me never to Call Kevin again. I also have knowledge of Kevin Brathwaite attempting to file charges against Salan Chapman for continuously following him around and harrassing him. But when he went to municipal court to file charges against her, he was refused because he didn't know her date of birth. I was more

EXH. 10

than willing to testify at Mr. Brathwaites trial. I also feel that if I had been subpoenaed to testify at Mr. Brathwaites trial, I am sure that the truth would have been revealed.

Your Honor, if there is any way that I can be of some assistance to right the wrong that has been done, Please Contact me at home, I will be more than happy to Cooperate.

Phone # 302-764-7855

Sincerely

Cassandra Moore

RONALD F. BASARA
NOTARY PUBLIC-DELAWARE
My Commission Expires Dec. 31, 2000

EXH. 11

A-58